[No. S024416. Mar. 25, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DELLANO LEROY CLEVELAND and CHAUNCEY JAMAL VEASLEY,
Defendants and Appellants.

706

710

712

## COUNSEL

Lynne S. Coffin, State Public Defender, under appointment by the Supreme Court, Donald J. Ayoob, Assistant State Public Defender, and Stephanie Clarke, Deputy State Public Defender, for Defendant and Appellant Dellano Leroy Cleveland.

David Joseph Macher, under appointment by the Supreme Court; and Jill M. Bojarski for Defendant and Appellant Chauncey Jamal Veasley.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—A jury convicted defendants Dellano Leroy Cleveland and Chauncey Jamal Veasley, as well as codefendant Rajeesh Prasad Charan, of robbing and murdering Anthony Nelson and Charles Hunter and of conspiring to commit murder. (Pen. Code, §§ 182, 187, 211.)[1] The jury found the murders to be in the first degree and under the special circumstances of multiple murder and robbery murder. (§ 190.2, subd. (a)(3), (17).) As to the murders and robberies, the jury also found that a principal was armed with a firearm. (§ 12022, subd. (a)(1).) The jury found that each defendant either was the actual killer, or intended to kill, or "with reckless indifference to human life and as a major participant," aided and abetted another in the commission of the robberies. (§ 190.2, subds. (b), (c), (d).) Both Cleveland and Veasley admitted a prior conviction allegation. (§ 667, subd. (a).)

The court bifurcated Veasley's penalty trial from that of Cleveland and Charan. At the conclusion of the penalty trials, the same jury returned a verdict of death as to all three defendants. The court denied Cleveland's and Veasley's automatic motions to modify the verdict (§ 190.4) and sentenced them to death.[2] This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgments.

### I. THE FACTS

#### A. Guilt Phase

##### 1. Prosecution Evidence

In the evening of October 12, 1990, the bullet-ridden bodies of Anthony Nelson and Charles Hunter, both drug dealers, were found lying down in room 140 of the All Star Inn in Pomona. They had died of multiple gunshot wounds, most but not all to the head. Both received four head wounds, each

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The court did, however, grant the modification motion as to Charan, so he is not a party to this appeal. Accordingly, we do not discuss facts relevant only to him.

of which alone might have been fatal. The evidence showed that a single gun, probably a nine-millimeter semiautomatic pistol, fired all of the bullets. The left pants pockets of both victims had been pulled out and were empty. Jewelry that Nelson normally possessed, including a watch, was missing.

Room 140 was at the back of the motel, not visible from the office. It had not been rented that day. It appeared the door to the room had been kicked in. Motel records showed that the nearby room 138 had been rented to "DeChauncey Veasley" on September 26, 1990. Some blood found at the scene was type A. That blood could not have come from either victim, but it might have come from Cleveland, as well as about a third of the general population. There was not enough of the blood for further typing. Veasley's fingerprints were found on the inside of the front door of room 140, above the doorknob.

Evidence showed that earlier on the day of the murders, the three defendants had invaded the Hesperia home of Jesus Valles, sometimes called "Chuey," who was also a drug dealer. A gunfight ensued in which Valles and Cleveland were both shot in the hand. Some of the bullets fired in this fight came from the same gun later used in the murders.

Dorcey Jackson testified that she introduced Nelson (known as "Rick") to Veasley (known as "Ocean") in July or August 1990. Sometimes she also saw Veasley with both Nelson and Hunter. In testimony admitted only against Veasley, Jackson said that Nelson and Veasley talked about engaging in drug transactions. She sometimes heard Veasley call Nelson on the telephone, and then Nelson would appear and talk about drug transactions.

At the time of the murders, Nelson lived in San Dimas with his girlfriend, Nicole Brown (who was Hunter's cousin), and Nelson's cousin, Arthur Walker. On the day of the murders, Hunter came to their house with a beeper. At one point, the beeper went off. Hunter looked at the beeper and said, "It's Ocean" (Veasley). Hunter made a telephone call, then gave the telephone to Nelson, who spoke for a while. A short time later, the telephone rang again. Nelson answered it and spoke for about five or 10 minutes. Then Nelson went into another room where he kept cocaine. He returned with a plastic bag containing what Walker estimated was about two or three ounces of rock cocaine. Nelson handed the bag to Hunter. The two then left around 2:00 p.m. Nelson said he was "going to the All Star" and would "be back in about a half hour." He indicated to Walker that he was going to "make a sale." Nelson and Hunter never returned.

Bobbie Jean Peterson, Veasley's wife at the time of these events, testified that in October 1990, she lived in Hesperia. It took about 30 to 45 minutes to

drive between Hesperia and Pomona. Veasley did not live with her at the time, but he sometimes visited. On October 11, 1990, Peterson was at her home with Veasley and Cleveland. She heard the two defendants talk "about going up the street later on in the evening when it got dark because they were going to rob" the house of a drug dealer called Chuey.

The next day, October 12, both defendants were again at her home. Veasley said that they had to get to Chuey's before noon. Veasley told Cleveland that he, Veasley, would have "to sit in the car because Chuey knew him," and that the others should "go in, get the money and get the drugs and meet him back outside." Later, both Cleveland's brother and codefendant Charan arrived. There was talk that "they had been waiting on them, let's go." Around 10:00 or 11:00 a.m., the defendants, Cleveland's brother, and Charan left together. They returned about an hour later.

Cleveland said he had been shot in the hand and asked Peterson to take out the bullet. He was bleeding on his hand, his clothes, and onto the floor. Peterson told him she could not take the bullet out, and he had to go to the hospital. Veasley was angry with Cleveland "because things hadn't went as planned." He said Cleveland "was getting weak and . . . he should have blasted all those people." Cleveland said "that there was another guy there and they had only expected one guy, they hadn't expected there to be shooting . . . ." He also said he "wasn't getting weak and that if [Veasley] thought of something else he would see . . . he was not weak." Veasley responded that it was "okay, that they could do something else." Cleveland said "that was okay with him."

Veasley said that "he was currently buying cocaine from a man named Rick down the hill. That he could beep this person, put in his code and that this man would call him right back. When he did that they could have . . . Rick meet them at a motel room and that they could take the drugs from him instead of paying for it." Cleveland said that was "fine." Veasley also said "they could go to Pomona and bump off his supplier." Veasley then paged Nelson. After about 10 minutes the telephone rang. While they were waiting for the call, Veasley told the others that "they could go to the All Star Inn in Pomona, that the security was lax there during the day." Veasley said that "they could go to a back room and kick in the door. And that he would go use another phone and call Rick and tell Rick where he was because he had already dealt with Rick at that motel before so it wouldn't be anything unusual. He said he would tell Rick what room and that he would go back over there and that the other men could wait in the bathroom and then when Rick got there they could come out." Cleveland said, "Okay."

When the telephone rang, Veasley answered. Peterson heard him say on the telephone "that he was on his way down the hill and that he needed to buy

three ounces." He also said that he had "some people with him, some people that had invested money, but they would leave the minute Rick got there." Veasley told Nelson that "he was going to get a motel and that he will call him." After the telephone call, Veasley told the others that "Rick would come with another guy, that he always brought a smoker," i.e., a cocaine user, "with him." Veasley also said "that they had to be taken care of because Rick knew him, knew the phone number to [Peterson's] house and that he [Veasley] had a wife and kids." Veasley called Nelson a "hollypopper"—a person who sells drugs but is not "street wise." He said that Nelson did not carry a gun. Nelson, he said, "had a lot of money and . . . wouldn't know any better. He wouldn't know not to go make a big deal like that at a motel room."

Cleveland asked which gun they should use. At this point, Peterson noticed that Charan had a handgun. Cleveland asked whether they should take the "nine millimeter or . . . the rifle." Charan said he did not want to use the nine-millimeter, which he referred to as his, "because they had just used it up the street." Cleveland said that "they should use the nine millimeter because a rifle was too loud, even if they shot it through a pillow, and that rifle made a lot of mess." They decided to use the nine-millimeter. Someone said they did not think the Hesperia matter would be connected with Nelson in Pomona. Peterson received a telephone call around this time from Jackson's son, Bobby. Veasley told Bobby he was on his way to Pomona to rob "you know who." Veasley, Cleveland, and Charan left around noon. By this time Cleveland was no longer bleeding.

Cleveland and Veasley returned around 8:00 or 9:00 that evening. Veasley was wearing a watch, something Peterson had never seen him wear before. He also possessed a baggie filled with rock cocaine. In testimony admitted only against Veasley, Peterson said that a couple of days later Veasley made statements to another person indicating Veasley's involvement in the incident at the All Star Inn.

Dion Morris testified that she knew Cleveland, Veasley, and Charan. One time when they were at her apartment, she saw Cleveland possess a .22-caliber gun, Veasley a sawed-off shotgun, and Charan a nine-millimeter handgun. On October 12, 1990, in the late afternoon, she received a telephone call from Veasley. Veasley told her that Cleveland had been shot in the hand and asked her if she knew someone who could take a bullet out. He also said that Cleveland "had got shot in his hand and that it was kind of like a shootout and made a joke about it." Cleveland then got on the telephone. He also said he had been shot in the hand and asked for Morris's help. Morris arranged for someone to look at Cleveland's hand. Cleveland came to her apartment around 11:00 that evening. His hand was swollen and bleeding, and he had blood on his shoes and "khakis." In testimony admitted only

against Cleveland, Dion said that Cleveland told her "that if he had went to the hospital that because he had a bullet wound that the doctors would call the police and that he would go to jail." In testimony admitted only against Veasley, Morris testified that sometime after October 12, Veasley told her that he had killed somebody in Pomona and had gotten two or three ounces of cocaine and a watch out of the murder.

Cindy Buttram testified that at the time of the murders, she was Cleveland's girlfriend. In testimony admitted only against Cleveland, she said that in October 1990, Cleveland told her he had been shot. She saw him later that day and observed the wound. The next day, October 13, she took him to the hospital, where he remained for three days. Hospital records showed that Cleveland was admitted to the Los Angeles County USC Medical Center on October 13, 1990.

In testimony admitted only against Cleveland, Detective John Holzberger testified that he interviewed Cleveland in January 1991. Cleveland's hand was injured but was healing. Cleveland told him he had been shot in a scuffle with a man who had been trying to break into Buttram's car. In testimony admitted only against Veasley, Detective Harry Moore testified that he interviewed Veasley in February 1991. Veasley denied knowing that Cleveland had been shot in the hand. He said he knew what the All Star Inn was and had been there once. He denied knowing anyone named Rick or Ricky from San Dimas. He also denied owning a gun and knowing the persons who had been killed at the All Star Inn in October 1990.

Telephone and pager company records confirmed the existence, although not the substance, of various telephone calls and pagings about which the witnesses testified.

### 2. Defense Evidence

Cleveland presented evidence regarding his being shot in the hand. Alvin Woods, Cleveland's uncle, testified that he lived on East Kingsley in Pomona. On October 12, 1990, he was outside watering some plants when he heard a gunshot. He turned and saw Cleveland and another person "playing" or "kind of tussling" with the gun. It appeared to Woods "like they was playing at the time and it just got out of hand." Woods also saw blood come from Cleveland's hand. Cleveland then entered a car and left. Dolores Glynn, Buttram's sister, testified that a bleeding Cleveland came to her house on October 12, 1990. He made a telephone call to Buttram, then left after about 20 minutes. Cleveland told her "he had been accidentally shot over on Kingsley." Rose Wentz, Buttram's employer, testified that on a Friday in October 1990, Buttram received a telephone call in the afternoon. Buttram

told Wentz that Cleveland had been shot in the hand. Buttram left work at the normal time, after 5:00 p.m. Buttram did not go to work the following Monday. She told Wentz that Cleveland was still in the hospital and wanted Buttram there.

Counsel for Veasley elicited on cross-examination of the fingerprint examiner that he could not determine when Veasley's fingerprint had been left on the door of room 140. Fingerprints can remain for a long time. Veasley also presented evidence of some of Peterson's previous statements in an attempt to challenge her credibility.

## B. *Penalty Phase*

Veasley's penalty phase was bifurcated from that of the other two defendants. Veasley's penalty phase was first, then Cleveland and Charan's.

### 1. *Veasley*

At prosecution request, the court judicially noticed that in 1984, Veasley was convicted of second degree commercial burglary, and in 1986, a "James English"—stipulated to be Veasley—was convicted of robbery with personal use of a gun. The prosecution presented evidence of the circumstances of the burglary, which involved breaking into a locked car and possessing a sawed-off shotgun.

In mitigation, Veasley presented the testimony of his mother, Tressie Williams, and other family members. Veasley was raised by his mother and stepfather. Veasley was very fearful of his stepfather, who abused him physically and mentally. Eventually, when Veasley was 16 years old, his mother told him about his natural father and suggested he meet him. Veasley was excited, but then he learned that the father had died, which saddened Veasley. Veasley then left home. The witnesses testified that he was kind, protective, and supportive to his siblings and his own four children. Veasley was an outstanding basketball player and received numerous basketball scholarship offers. He was good with children and they loved him.

### 2. *Cleveland*

At prosecution request, the court judicially noticed that in 1986, Cleveland was convicted of possession for sale of cocaine. The prosecution also presented evidence that he had other convictions for assault with intent to commit murder, robbery, kidnapping, and assault with a deadly weapon on a peace officer. It presented evidence of the circumstances of those crimes. In August 1980, Cleveland, armed with a pistol, and another person accosted a

man and woman in the couple's car, stole some of their property, and drove away with the man in the car. Eventually, Cleveland shot the man and fled. In January 1984, Cleveland drove his car into a police officer who had stopped him for speeding.

In mitigation, Cleveland presented the testimony of his grandmother, of the minister who had presided over Cleveland's wedding, and others who testified about his good qualities. Cleveland often helped his uncle, Alvin Woods, who was a paraplegic. He was good with children and loved dogs. He attended and helped out at church. Some of the witnesses testified that he was too good a person to receive the death penalty.

Cleveland also called as a witness Peterson, who had testified at the guilt phase. Before her testimony, the court informed the jury that what she was about to say had been legally inadmissible until then. Peterson testified that the night of the murders, Veasley told her that he had made Nelson and Hunter lie down on the floor with their hands behind their backs, made them "scoot on their bellies with their heads up against the door," and then shot them each twice in the head.

## II. Discussion[3]

### A. Pretrial Issues

#### 1. Cleveland's Complaints About Counsel

Cleveland was arrested in this matter long after the other two defendants. He first appeared in municipal court on March 13, 1991, and Lee Coleman was appointed to represent him. After the preliminary hearing, he was arraigned in superior court on May 13, 1991, and Coleman was appointed to represent him in that court. On May 16, 1991, Cleveland stated that he was opposed to going beyond the statutory time period for trial. The court set the matter for hearing on June 12, 1991. On that date, the district attorney said the prosecution would be ready for trial on July 1, 1991. Counsel for both Veasley and Charan said they would not be ready for trial so soon. Coleman said that he, too, would not be ready for trial by then, explaining, "We have tremendous volume [of discovery], close to 3,000 pages of documents and approximately an additional hundred that we received yesterday, the 26 video tapes and 8 audio tapes, quite extensive preparation required in this case because of the complexity of the case, and I will not be ready on the 1st of July." Coleman said he would ask Cleveland to waive time until September.

---

[3] Both Cleveland and Veasley join arguments of the other to the extent they may inure to their benefit.

The court asked Cleveland if he would waive time. Cleveland asked if he could "say something besides the question that you asked me." The court agreed. Cleveland then said, "I would like to file for a 1387 under section 3, 4 and 5. A 1040 change of venue on the grounds that I feel that he's had ample amount of time to get everything. We have been gone a month, and he just got the tapes yesterday, and just like I feel he's not—he's isn't representing me to his fullest ability." The court asked whether it was his desire not to waive time. Cleveland said it was. Accordingly, because Cleveland did not waive time, the court maintained the July 1 trial date.

The next hearing was held on June 20, 1991. Charan moved to continue the trial. Coleman also requested a continuance on behalf of Cleveland. Cleveland, however, stated he objected to a continuance. When the court asked why, he responded: "Well, like I stated last week, . . . my attorney—I mean, I don't know nothing. He never tells me what's going on in the case and what he's doing and how far he's gone. So I don't know where we're at, anyway. I know the complexity of the case, but that's it, because I just know the charges." The court asked Coleman to comment. Coleman said, "I discussed with my client facts of the case. I've also indicated to him how far I am in the papers that we have. I think I've indicated to him before that I've covered approximately 500 pages of the additional information that's come in, and I've asked him to cooperate and give us additional time to work on the case." Cleveland responded that Coleman "told me he went 700 pages last week, and that was it. As I've stressed last week, under Penal Code 1387—" The court then ascertained that both Veasley and Charan had no objection to continuing the case. It then found good cause for a continuance due to the nature of the charges, the amount of discovery, and the investigation the case warranted. Over Cleveland's objection, it granted a continuance until September. The case was assigned for trial on September 11, 1991.

During Charan and Cleveland's penalty phase, Cleveland told the court he wanted to say something in his defense. The court cautioned Cleveland that it would hear any statement he wanted to make, but he should first discuss it with Coleman. Cleveland responded, "How can I discuss something with someone that doesn't listen to me?" The court reiterated that it would "entertain" a statement, but it put the matter over so Cleveland could think about it and talk to Coleman. In Cleveland's absence, the court told Coleman there may be a potential "*Marsden* motion" (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]), and that he may wish to discuss the matter with Cleveland. Coleman responded, "I will. Just the difficulty in paying attention to what's happening in the case and trying to have an interview with Mr. Cleveland here at the counsel table, and it doesn't work out too well."

At the next hearing, the court asked Cleveland whether he had further discussions with Coleman. Cleveland said, "I talked to my counsel during lunch break and feel I don't want to drop the issue completely." The court asked if Cleveland wanted to exclude the prosecutor from the hearing and said it would do so if requested. Cleveland said he "would like to reserve the right until a later time." The court explained to Cleveland that if there were any conflict between him and Coleman, Cleveland had the right to inform the court with the prosecutor and maybe even the other defendants excluded, and that he could also reserve the matter until later. Cleveland said he would reserve it.

After the death verdict, when the court was scheduling the hearing on the automatic motion to modify the verdict, Coleman stated that Cleveland did not wish to waive time. The court told Cleveland it would give him another opportunity to discuss the matter with Coleman because these were important issues. Cleveland said, "My life was important too, and I feel I was crossed, so no, he don't know how to represent me." He said, "I don't even wish to have him [a] long time ago." Accordingly, the court set the hearing on the modification motion within the statutory time period. At the outset of that hearing, the court, anticipating a possible *Marsden* motion, explained to Cleveland that he had the "right to be heard in reference to any issue that you want to bring to my attention regarding either conflicts that exist between you and Mr. Coleman or your belief that you have been denied effective represen- tation . . . ." It further explained that if Cleveland wanted to make a "*Marsden* motion" it would exclude the prosecutor, and Cleveland could "tell me your specific reasons as to why you think a conflict exists or why you're not receiving effective representation." It asked if Cleveland wanted to be heard. Cleveland responded, "I waive." When the court again asked if he wanted "to be heard in reference to that," he said, "No."

■ Cleveland now argues the court violated its duty to inquire into the reasons for his complaints that Coleman's performance was inadequate. The record does not support the contention. If a defendant seeks new counsel on the basis that his appointed counsel is providing inadequate representation, the court must permit him to explain the basis of his contention and to relate specific instances of inadequate performance. (*People v. Hart* (1999) 20 Cal.4th 546, 603 [85 Cal.Rptr.2d 132, 976 P.2d 683].) But Cleveland never asked for new counsel even though the court invited him to do so. ■ A defendant need not make a formal motion, but he must provide some clear indication that he wants a substitute attorney. (*People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150].) It is true that early in the pretrial proceedings, Cleveland complained that his attorney had not taken certain steps, and he refused to waive time. But he did not indicate he wanted a new attorney so soon in the process. The court listened to and accepted his refusal to waive time, although it ultimately exercised its discretion to

continue the matter at the request of Cleveland's attorney and both of the codefendants due to the nature of the case. The fact that Coleman, in common with counsel for the codefendants, believed he needed more than 60 days to prepare to defend a capital case gives no reason to suspect his performance was or would be inadequate, and Cleveland's complaint in this regard is no substitute for stating in some way that he wanted a new attorney.

### 2. *Denial of Separate Trials*

Cleveland and Charan, but not Veasley, moved to sever their trial from that of the codefendants on the basis that their codefendants had made statements incriminating them. The court asked counsel to itemize in declaration form what the statements were so it could make an informed ruling. Counsel for Charan, but not for Cleveland, filed such a declaration itemizing the alleged statements. The district attorney then filed a response to the motion, discussing the statements item by item. Counsel for Charan later filed another declaration additionally identifying Veasley's statement to Peterson that he, Veasley, had been the actual gunman as another basis for severance. He argued that a separate trial was necessary so that this statement could be admitted at Charan's penalty trial.

At the hearing, counsel for Cleveland joined Charan's declarations. The court expressed doubt that counsel could do so, but it ultimately considered the declarations as to both Cleveland and Charan. The court denied the severance motions. While reserving specific evidentiary rulings for trial, the court stated its belief that some of the statements were either admissible or could be adequately redacted to protect the nondeclarants. It said it would give limiting instructions as needed. But it also expressed concern about some of the statements and warned the district attorney that, because she was resisting severance, she would not be able to use any statements that were inadmissible against a nondeclarant defendant and could not be adequately redacted. The court also denied severance to the extent the motion was based on Veasley's statement that he had been the actual gunman, although it stated that it would consider an alternative solution such as a bifurcated penalty phase.

Cleveland argues the court erred in denying severance. The Attorney General responds, first, that Cleveland has waived his current arguments because he did not present a declaration separate from Charan's. We disagree. Ultimately, the trial court considered Charan's declarations as to both Charan and Cleveland. Cleveland made his arguments to the court, and the court rejected them. The issue is properly before us on appeal. We also disagree, however, that the court erred. Veasley, Charan, and Cleveland were all charged with the same crimes arising out of the same events. "There is a statutory preference

for joint trial of jointly charged defendants. (§ 1098.) 'A "classic" case for joint trial is presented when defendants are charged with common crimes involving common events and victims.' " (*People v. Pinholster* (1992) 1 Cal.4th 865, 932 [4 Cal.Rptr.2d 765, 824 P.2d 571].) "An appellate court reviews a trial court's ruling on a motion for separate trials for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 189 [58 Cal.Rptr.2d 385, 926 P.2d 365].) "Under Penal Code section 1098, a trial court *must* order a joint trial as the 'rule' and *may* order separate trials only as an 'exception.' " (*Id.* at p. 190.)

■ Separate trials may be necessary if a codefendant has made an incriminating confession, association with codefendants may be prejudicial, evidence on multiple counts may cause confusion, there may be conflicting defenses, or a codefendant may give exonerating testimony at a separate trial. (*People v. Pinholster, supra,* 1 Cal.4th at p. 932.) The charges against each defendant were identical, so there was no danger of jury confusion, and we see no prejudicial association. There was no indication that any of the defendants would have provided exonerating testimony at a separate trial. It was not clear the defendants would have conflicting defenses. But even if there were conflicting defenses, that circumstance alone would not mandate severance. (*People v. Alvarez, supra,* 14 Cal.4th at p. 190; *People v. Cummings* (1993) 4 Cal.4th 1233, 1286–1287 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Except for the danger of incriminating statements, this was a classic case for joint trial.

At trial, Cleveland argued that statements by Veasley would prejudice him, thus requiring severance. The court was very aware of the need to protect Veasley's codefendants. It stated its intent to exclude any statements that were inadmissible against a codefendant and that could not be adequately redacted. Judging the circumstances as they appeared at the time of the hearing on the severance motion (*People v. Pinholster, supra,* 1 Cal.4th at p. 932), the court reasonably concluded that redaction or, as necessary, exclusion of the statements would adequately protect Cleveland. Accordingly, the court acted within its discretion in denying severance.

"After trial, of course, the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." (*People v. Turner* (1984) 37 Cal.3d 302, 313 [208 Cal.Rptr. 196, 690 P.2d 669].) Because the trial court promised to protect the nondeclarants' rights when it denied severance, it is especially necessary to review the actual trial to see if the court succeeded in doing so. We have reviewed the record. The statements that were admitted against Cleveland were properly admitted.

The statements that were admitted solely against Veasley were adequately redacted, and the court gave adequate limiting instructions, so as to protect Cleveland.

Against this conclusion, Cleveland argues that the "trial court's failure to sever [his] trial turned out to be prejudicial in several easily predictable ways." Some of his claims are irrelevant to the actual trial. He notes, for example, that at the preliminary hearing, Peterson testified that when Veasley and Cleveland returned home the evening of the double murder and she observed Veasley wearing a watch, she told Veasley, "You did it." Cleveland argues that the accusation was not admissible against him as an adoptive admission. He may be correct in the abstract, but it does not matter because the district attorney agreed not to ask Peterson about the accusation, and she did not mention it at trial.

The court admitted some of Veasley's statements solely against Veasley. Cleveland challenges some of these rulings. Cleveland claims the court improperly permitted Jackson to testify that in the summer of 1990, Nelson and Veasley talked about engaging in drug transactions. However, the court admitted the evidence solely against Veasley, it gave the limiting instruction Cleveland requested, and the evidence did not implicate Cleveland at all. On another point, Peterson testified at the preliminary hearing that sometime after the murders, Veasley told another person that "it was just a spur of the moment thing and he already had people with him." Cleveland argues that a statement like this that does not use his name but refers to the existence of other participants is prejudicial. (See *People v. Fletcher* (1996) 13 Cal.4th 451, 468 [53 Cal.Rptr.2d 572, 917 P.2d 187].) Again, this argument disregards the actual trial testimony. *At trial*, Peterson testified only that Veasley said "it was a spur of the moment decision." She did not mention Veasley's additional statement that other people were with him. "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 107 S.Ct. 1702]; see also *People v. Fletcher, supra,* at p. 464.) Another of Veasley's statements that Cleveland discusses similarly contained no reference to Cleveland's existence. Morris testified that Veasley told her that "he had killed somebody" in Pomona and "he" had gotten some cocaine and a watch. Admitting this statement against Veasley did not violate Cleveland's rights.

Cleveland also argues he was prejudiced by the admission, without limiting instructions, of Peterson's testimony about the conversation between Veasley and himself after the first robbery attempt and before the murders, in which

Veasley said that Cleveland "was getting weak" and that "he should have blasted all those people." Cleveland responded that he was not getting weak and that if Veasley "thought of something else he would see . . . he was not weak." Cleveland argues that this testimony supplied a motive for his participation in the later murders. We agree that the testimony supplied a motive, but properly so. Cleveland participated in the conversation, and it was admissible against him. To the extent the conversation implied that Cleveland had participated in the previous robbery attempt, it was properly admitted as an adoptive admission. (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998 P.2d 969].) To the extent it offered a motive for the later killings, it was not hearsay. It showed that Veasley *accused* Cleveland of being weak, and that Cleveland wanted to demonstrate his lack of weakness. This was relevant to show motive. But it was not offered to prove the truth of the matter stated, i.e., the prosecution did not offer it to show that Cleveland was, in fact, weak. (Evid. Code, § 1200.)

Cleveland also complains of Morris's testimony that after the killings, Veasley called her on the telephone, told her that Cleveland had been shot in the hand, and asked if she knew someone who could take a bullet out. The court admitted the evidence as the statement of a coconspirator. (Evid. Code, § 1223.) We need not decide whether these statements, made after the killings but in an effort to obtain medical care for Cleveland, were made during and in furtherance of the conspiracy (see *People v. Sanders* (1995) 11 Cal.4th 475, 516 [46 Cal.Rptr.2d 751, 905 P.2d 420] ), or were otherwise admissible against Cleveland, for we find no prejudice. Immediately after Morris spoke with Veasley, Cleveland himself told her he had been shot and asked for assistance. Moreover, ample other evidence established that Cleveland had been shot. Veasley said there had been a shootout, which Cleveland did not repeat, but this slight difference could not have been prejudicial.

Cleveland also claims that he and the codefendants had conflicting defenses that required severance. He focuses on cross-examination of Peterson by Charan and Veasley that elicited, on redirect examination, testimony that Cleveland later made threats to Peterson. Some defendants will sometimes cross-examine witnesses differently from another defendant, and may thus elicit testimony on redirect examination that another defendant would not elicit, but such differences in trial tactics do not mandate severance. (*People v. Alvarez, supra,* 14 Cal.4th at p. 190; *People v. Keenan* (1988) 46 Cal.3d 478, 500–501 [250 Cal.Rptr. 550, 758 P.2d 1081].) "If the likelihood of antagonistic testimony alone required separate trials, they 'would appear to be mandatory in almost every case.' " (*People v. Keenan, supra,* at p. 500, quoting *People v. Turner, supra,* 37 Cal.3d at p. 313.)

 Cleveland also argues that questions the jury asked during deliberations regarding one of the verdict forms showed that joinder prejudiced him. The

verdicts as to each defendant included a special finding of either true or not true that the particular defendant was the actual killer. The jury asked a number of questions regarding this form, including what to do if it could not agree on who the actual killer was. Ultimately, the jury found not true that either Veasley or Charan was the actual killer, and it left the finding blank as to Cleveland. Cleveland claims that this "confusion resulting from multiple counts further mandated a separate trial." We disagree. Any confusion was not due to the joint trial but to the fact the evidence did not establish who the actual killer was. Indeed, the prosecutor conceded to the jury that "the evidence is not there who the actual shooter is." But, as the prosecutor also argued, for purposes of guilt, it did not "matter which one of them pulled the trigger." Each of the defendants could be guilty of the substantive crimes as an aider and abettor even if he was not the actual killer. (See generally *People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117 [108 Cal.Rptr.2d 188, 24 P.3d 1210].) Moreover, any defendant who was either the actual killer, or intended to kill, or "with reckless indifference to human life and as a major participant," aided and abetted another in the commission of the robberies, was death eligible. (§ 190.2, subds. (b), (c), (d).) The jury made this finding as to each of the defendants, including Cleveland. The joint trial did not create the uncertainty over who was the actual killer, and that uncertainty did not require separate trials.

Finally, Cleveland argues that the joint trial prevented him from presenting Peterson's testimony that Veasley had admitted to her that Veasley was the actual gunman. The evidence was inadmissible at a joint trial because Veasley asserted the confidential marital communication privilege. (Evid. Code, § 980.) Neither Cleveland nor Charan suggested at trial that he wanted to admit this evidence at the *guilt* phase. Indeed, Cleveland objected to all hearsay statements by Veasley at the guilt phase. Peterson's testimony could not have aided them at the *guilt* phase because, as noted, each defendant could be found guilty and death eligible without being the actual killer. However, as the trial court recognized, this evidence could be helpful to Cleveland and Charan at the *penalty* phase—after the jury had found them guilty—as arguably reducing their personal culpability for the crimes. For this reason, the court bifurcated the penalty trials, with Veasley's going first, followed by that of Cleveland and Charan, at which the jury heard Peterson's testimony. We consider below whether this bifurcation was proper, but if, as we conclude, it was proper, then severance was not required.

In short, we find no abuse of discretion in the trial court's following the norm and permitting a joint trial for the three defendants.

## B. *Jury Selection Issues*

### 1. *Prosecutor's Exercise of Peremptory Challenges*

The prosecution exercised four peremptory challenges against African-Americans. After each of these challenges, the defendants jointly made "*Wheeler* motions" (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]), arguing that the prosecutor improperly excused those prospective jurors because of their race. Defendants contend the court erred in denying the motions. As we explain, we disagree.

### a. *Factual Background*

The first *Wheeler* motion came after the challenge of Prospective Juror S. In the written juror questionnaire, S. had stated, "I feel it would be difficult to sentence anyone to death. Justice may make it necessary for someone to have to die. I don't think I could handle sentencing someone to death or participating in the decision." She also answered, "I believe I could," to the question whether she could set aside her feelings and follow the law. At voir dire, she stated she felt "that in certain circumstances in cases, the death penalty is warranted." The district attorney challenged S. for cause on the basis of her answers to the questionnaire. The court asked her follow-up questions. S. stated that "if justice has to be done, that's justice, but I still would feel bad having to send someone to death." She indicated she could return a death verdict, but also said "if I didn't have to participate on the jury, I feel that would be better for me." After the court denied the challenge for cause, the prosecutor excused S. peremptorily. The defendants, noting that they are African-American, made a *Wheeler* objection. (Later Charan's attorney clarified that Charan is "East Indian.") The court denied the motion, finding that defendants had not "made a prima facie case of excusing any group based on any racial considerations."

The second motion came after the challenge of Prospective Juror L. At voir dire, L. had stated, "I'm not in favor of the death penalty, but I do understand that by law it is acceptable and at time necessary." She also stated she would follow the law. After the prosecutor excused L., the defendants argued that "it appears that a pattern is being established." The court again found no prima facie case and had the record "reflect that there's three jurors in the jury box who are Black."

The third motion came after the challenge of Prospective Juror J. In her jury questionnaire, J. had stated that her son had been in juvenile detention in the county jail "for carrying a gun in his car and for stealing." She also stated that after a job-related injury she had seen a psychiatrist for stress. Regarding

the death penalty, she stated, "I am with the law. If the law says death penalty, I am for it. I believe in upholding the law." At voir dire, she said she could be fair. The district attorney requested the court to ask follow-up questions of J., expressing concern that J. might not "really understand that it's always a weighing and evaluating process, that you're not going to tell them that under certain circumstances death is the appropriate answer." The court denied the request for follow-up questions, and the prosecutor then challenged J. peremptorily. The defendants renewed their objection. They noted that at that point, the prosecutor had used three of her seven peremptory challenges on African-Americans. The prosecutor noted for the record that the two murder victims were also African-American. The court again found no prima facie case.

The final motion came after the challenge of Prospective Juror F. F. had stated on her questionnaire that she was a "seamer," but that she had licenses for both "LVN" and "psychiatric technician," and that her husband was "self employed starting a group home." The district attorney asked the court to ask follow-up questions of F., both about her husband "as to what kind of a group home" and "what does he actually do for a living," and regarding F. herself. The district attorney explained that F. said she had licenses as a nurse and as a psychiatric technician but worked as a "seamer." She was "wondering whether she's ever used her psychiatric technician's license and what that is or her LVN degree and what that is and how that jives with her being a seamer." The court denied the request for follow-up questions.

After the prosecutor challenged F., defendants noted that the challenge was the fourth against African-Americans out of 10 prosecution challenges to that point. One of the defense attorneys noted that the court had been stating the number of African-Americans remaining on the jury panel and argued that was not relevant. The court responded that it was just supplementing the record in this regard. It again found no prima facie case. It also stated that the first *Wheeler* motion had no basis whatever and, in the court's view, had been merely a "tactical move to . . . chill the prosecutor from utilizing the peremptories."

Later the court supplemented the record regarding the *Wheeler* motions. It stated that in denying the motions, it had "carefully reviewed each and every one of the questionnaires supplied by the jurors who were excused by the People," and it "also took into consideration their demeanor and manner of responding to the questions in open court." Based on all of this, the court reiterated that it "did not find that the defendants have met the standard enunciated in [*People v. Wheeler, supra,* 22 Cal.3d 258] that a reasonable inference arises that the challenges were used on the ground of group bias alone." It added that it had "carefully reviewed all the information I have

before me regarding the particular jurors who have been excused by the People and the last thing I will let happen is any type of systematic exclusion based on race or any other basis." One of the attorneys pointed out that witness Peterson "is a White woman." The court responded that it had been unaware of that fact, but it did not change its rulings.

Eventually, the jury was selected, with the prosecutor using four of a total of 14 peremptory challenges against African-Americans. After that, the court again supplemented the record to add that the final jury included "four Afro Americans, one in the alternate position. One of the six, the regular jury is composed of one third Black or Afro Americans."[4] It also noted that the jury pool came from Pomona which, the court estimated, was about "seven percent in terms of Black or Afro American."

### b. *Analysis*

■ "Exercising peremptory challenges because of group bias rather than for reasons specific to the challenged prospective juror violates both the California Constitution and the United States Constitution." (*People v. Johnson* (2003) 30 Cal.4th 1302, 1308 [1 Cal.Rptr.3d 1, 71 P.3d 270], cert. granted *sub nom. Johnson v. California* (2003) 540 U.S. 1045 [157 L.Ed.2d 692, 124 S.Ct. 817]; see also *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712].) "A presumption exists that a prosecutor has exercised his or her peremptory challenges in a constitutional manner." (*People v. Crittenden* (1994) 9 Cal.4th 83, 114 [36 Cal.Rptr.2d 474, 885 P.2d 887].) To overcome this presumption, the defendant must make a timely objection, then make a prima facie case that the jurors were excused on an improper basis. (*Id.* at p. 115.) In *People v. Wheeler, supra,* 22 Cal.3d at pages 280–281, we said that to establish a prima facie case, the challenger must show a "strong likelihood" or a "reasonable inference" of group bias. We recently explained that this "means that to state a prima facie case, the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." (*People v. Johnson, supra,* at p. 1318.)[5] Here, each time the defendants objected, which was each time the prosecutor challenged an African-American, the court found no prima

---

[4] This statement is somewhat ambiguous as to whether the four African-Americans the court mentioned included the alternate. The statement that the regular jury was "one third Black," and the fact that there were six alternate jurors, implies that the 12 members of the regular jury included four African-Americans and a fifth African-American was an alternate. Whether the regular jury contained three or four African-Americans does not affect our decision.

[5] The United States Supreme Court granted a petition for writ of certiorari in *Johnson* to decide whether this test satisfies *Batson v. Kentucky, supra,* 476 U.S. 79. (*Johnson v. California, supra,* 540 U.S. 1045 [124 S.Ct. 817].) The exact test is not critical to our resolution of this case. The facts here do not give rise to any reasonable "inference of discriminatory purpose." (*Batson v. Kentucky, supra,* at p. 94.)

facie case. "Because these rulings call upon trial judges' personal observations, we review them with considerable deference." (*People v. Johnson, supra,* at p. 1325; see also *Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677 (in bank).) "[I]f the record suggests grounds on which the prosecutor might reasonably have challenged the jurors, we affirm that ruling." (*People v. Johnson, supra,* at p. 1325.)

The record in this case suggests nonracial reasons for each of the four challenges to African-Americans. Valid reasons for the first excusal, of Prospective Juror S., are readily apparent. S. expressed doubt that she could "handle sentencing someone to death or participating in the decision." Other statements that she could follow the law and could return a death verdict warranted the court's denying the prosecutor's challenge for cause, but her overall reservations about the death penalty certainly provide a race-neutral explanation for her challenge. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1202 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) Indeed, the trial court found the objection to this first peremptory challenge so meritless that it believed it to be merely a tactical move to chill the prosecution's later use of peremptory challenges. Of course, a prosecutor, like any party, may exercise a peremptory challenge against anyone, including members of cognizable groups. All that is prohibited is challenging a person *because* the person is a member of that group. The challenge to S. gave no cause for the trial court to suspect group bias.

█ The record also suggests reasons for the prosecutor's later challenges to African-Americans. L. also expressed reservations about the death penalty. J. had a son who had been in county jail on criminal charges, and she had seen a psychiatrist for stress following a job-related injury. "[A] prosecutor may reasonably surmise that a close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution." (*People v. Farnam* (2002) 28 Cal.4th 107, 138 [121 Cal.Rptr.2d 106, 47 P.3d 988].) F. worked as a "seamer" although she had licenses as a nurse and psychiatric technician, and a husband who was starting some kind of a group home. As to both J. and F., the prosecutor requested the court to ask follow-up questions. The trial was held at a time when the trial court had primary responsibility to conduct voir dire (see *People v. Johnson, supra,* 30 Cal.4th at p. 1328), and the court denied the prosecutor's request. But we have stated that one consideration in deciding whether a prima facie case exists is whether the party engaged the challenged jurors "in more than desultory voir dire, or indeed [asked] them any questions at all." (*People v. Wheeler, supra,* 22 Cal.3d at p. 281.) Here the prosecutor tried to question them further, which also suggests a nonracial motivation for their excusal.

█ We add that although Cleveland and Veasley were themselves African-Americans, so too were their victims. (Cf. *People v. Wheeler, supra,* 22

Cal.3d at p. 281 [it is relevant that the defendant is a member of the excluded group "and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong"].) Apparently Peterson, a key prosecution witness, was White, but the trial court reasonably concluded that circumstance did not compel a finding of a prima facie case. Moreover, although at first the prosecutor exercised peremptory challenges against African-Americans at a somewhat higher rate than the percentage of their presence on the jury panel (a circumstance the court recognized), the overall statistics are not particularly suspicious. The prosecutor used three of her first seven challenges against African-Americans, but only one of the next seven. After the fourth peremptory challenge, she had used four of 10 against African-Americans, but ultimately only four of 14. Depending on whether the actual jury had three or four African-Americans, the final excusal rate was either slightly higher or slightly lower than the rate of African-Americans who were not challenged. Although not dispositive—a single race-based challenge is improper—this circumstance is probative. (*People v. Turner* (1994) 8 Cal.4th 137, 168 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

Defendants argue that not only were the four prospective jurors at issue African-Americans, they were also women. We have held that "Black women are a cognizable subgroup for *Wheeler*." (*People v. Clair* (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705], citing *People v. Motton* (1985) 39 Cal.3d 596, 605–606 [217 Cal.Rptr. 416, 704 P.2d 176].) But at trial, defendants never objected that the prosecutor excused these prospective jurors because of their gender. Accordingly, any such claim is not cognizable on appeal. (*People v. Bolin* (1998) 18 Cal.4th 297, 316 [75 Cal.Rptr.2d 412, 956 P.2d 374].) Moreover, the reasons that refute a race-based challenge would also have refuted a sex-based challenge had one been made.

Cleveland asserts that the trial court misunderstood its obligations and "improperly focused exclusively on the presence of African-American jurors remaining in the box and in the venire when it denied the defense *Wheeler* motions." It did not do so. Although it made sure the record reflected these matters, it also reviewed the jurors' questionnaires and their responses and demeanor in court. We see no basis to overturn its rulings.

### 2. *Excusing a Prospective Juror for Cause*

■ Veasley argues that the trial court erroneously excused one prospective juror for cause because of his views on the death penalty. Defendants did not object to the court's excusing the juror, but they also refused to stipulate to it. Contrary to the Attorney General's argument, this failure to object does not forfeit the right to raise the issue on appeal, although it does

suggest counsel concurred in the assessment that the juror was excusable. (*People v. Memro* (1995) 11 Cal.4th 786, 818 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

 On the merits, we find no error. The trial court may excuse for cause a prospective juror whose views on the death penalty would prevent or substantially impair the performance of the juror's duties. On appeal, we uphold the trial court's ruling if the record fairly supports it, and we accept as binding the trial court's determination of the juror's true state of mind if the juror has made conflicting or ambiguous statements. (*People v. Mayfield* (1997) 14 Cal.4th 668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Here, the court found that the juror had "views that he simply can't put aside," and that "his views both personal and religious will substantially impair his performance as a juror."

The juror expressed concerns on the juror questionnaire about his ability to return the death penalty. At voir dire, he said that he believed there is "never an appropriate time to take one's life." He also said he would try to follow the court's instruction, "yet when it comes right down to it, it would be hard to disengage what I believe with how I make my decision." He thought he "would not want to use the death penalty no matter how aggravating the circumstances," and he did not "really know" whether he could ever impose the death penalty. When the court specifically asked whether his views would substantially affect his ability to follow the law, he responded, "I think they might. I think there's an issue of the law and then there's the thing against principles that may rise above that at the time, and that's where that might come into play." These statements support the court's ruling.

### 3. *Other Jury Selection Issues*

One of the prospective jurors was a retired law enforcement officer with substantial experience in homicide cases who had testified in court over a thousand times. At one point in the voir dire, he expressed the opinion that the death penalty was "too seldom [used] due to legal obstructions." Later the defense challenged the juror for cause. The court initially denied the motion but agreed to ask follow-up questions regarding the juror's ability to be fair. The court then asked the juror if he could be fair to both sides. The juror responded, "To be perfectly honest, your honor, I think it would beunfair to the defense based on my knowledge of how these trials are conducted." After a few more questions, the court conducted the rest of the questioning of this juror outside the hearing of the rest of the prospective jurors. Eventually, the court excused the juror for cause pursuant to stipulation.

 Cleveland argues that the prospective juror's statements that the death penalty was too seldom used due to legal obstruction, and that he would be

unfair to the defense based on his knowledge of how these trials were conducted, tainted the entire venire. The issue is not cognizable on appeal because defendants did not ask the court to dismiss the venire or even admonish the jury. (*People v. Medina* (1995) 11 Cal.4th 694, 743–744 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Defendants cannot proceed with the jury selection before this same panel without objection, gamble on an acquittal, then, after they are convicted, claim for the first time the panel was tainted. (See *People v. Saunders* (1993) 5 Cal.4th 580, 589–590 [20 Cal.Rptr.2d 638, 853 P.2d 1093]; *People v. Rogers* (1978) 21 Cal.3d 542, 547–548 [146 Cal.Rptr. 732, 579 P.2d 1048].)

██ We also find no error. Many prospective jurors express many different general opinions regarding the judicial system. These expressions of opinion do not taint the jury. The comments here did not give the other prospective jurors information specific to the case, but just exposed them to one person's opinion about the judicial system. (Cf. *Mach v. Stewart* (9th Cir. 1997) 137 F.3d 630.) The circumstance that this particular opinion came from a retired peace officer with experience in homicide cases and trial proceedings does not change matters. It would no more prejudice a jury panel to hear that a retired (or active) peace officer believes the system is tilted in favor of defendants than to hear a criminal defense attorney express the opposite view. To the extent defendants argue the court should have held voir dire out of the hearing of the rest of the panel, the issue is not cognizable because they did not so request at trial. Moreover, the court had discretion to proceed as it did. (Code Civ. Proc., § 223; *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The court did conduct the remainder of the questioning of this prospective juror out of the hearing of the panel. Veasley also suggests the court should have "reinforced the concept of the presumption of innocence." As he recognizes, defendants did not so request. Moreover, earlier in the voir dire of this same prospective juror, the court did just this. Defendants also assert that the prospective juror's statements "implicated" their right of confrontation. (U.S. Const., 6th Amend.) However, the prospective juror was not a witness against them. They also assert the prospective juror's comment about the death penalty's being too seldom used improperly reduced the jurors' sense of responsibility. (See *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633].) It did not do so. Again, the statement was just one person's opinion, not a judicial pronouncement or even a comment by the prosecutor. (Cf. *People v. Medina, supra*, 11 Cal.4th at pp. 743–744.)

██ Veasley challenges other aspects of the jury selection. At the time this jury was selected, the trial court bore primary responsibility to conduct voir dire. (Code Civ. Proc., former § 223; see *People v. Johnson, supra*, 30 Cal.4th at p. 1328; *People v. Box* (2000) 23 Cal.4th 1153, 1178 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Veasley faults the way in which it carried out this responsibility.

He claims the court improperly "examin[ed] the venire members for the purpose of rehabilitation rather than to disclose bias and prejudice." At trial, defendants objected on essentially this basis and asked the court "to confront the [prospective juror] with what he or she has said [in the jury questionnaire], ask them to explain that." We find no error. Code of Civil Procedure former section 223 was adapted from federal practice. (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1309 [7 Cal.Rptr.2d 676].) Accordingly, decisions of the United States Supreme Court are especially persuasive in this area. They have made clear that "the conduct of voir dire is an art, not a science," so " '[t]here is no single way to *voir dire* a juror.' " (*People v. Taylor, supra,* at p. 1313, quoting *Mu'Min v. Virginia* (1991) 500 U.S. 415, 451 [114 L.Ed.2d 493, 111 S.Ct. 1899] (dis. opn. of Kennedy, J.).)

"The Constitution . . . does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury." (*Morgan v. Illinois* (1992) 504 U.S. 719, 729 [119 L.Ed.2d 492, 112 S.Ct. 2222], quoted in *People v. Box, supra,* 23 Cal.4th at p. 1179.) The high court has "stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." (*Mu'Min v. Virginia, supra,* 500 U.S. at p. 427 [trial court is not required to ask content-based questions regarding pretrial publicity]; see also *People v. Taylor, supra,* 5 Cal.App.4th at p. 1313.) Accordingly, "the trial court retains great latitude in deciding what questions should be asked on *voir dire,*" and " 'content' questions," even ones that might be helpful, are not constitutionally required. (*Mu'Min v. Virginia, supra,* at pp. 424, 425.) To be an abuse of discretion, the trial court's failure to ask questions "must render the defendant's trial fundamentally unfair." (*Id.* at pp. 425–426.) "Such discretion is abused 'if the questioning is not reasonably sufficient to test the jury for bias or partiality.' " (*People v. Box, supra,* at p. 1179.)

We have examined the voir dire, including the court's questioning of five prospective jurors that Veasley specifically challenges, and find no abuse of discretion. The court did sometimes ask follow-up questions at defense request, such as the questions that elicited the response from the retired peace officer discussed above. As to the five specific prospective jurors, either the defendants requested no follow-up questions or the court did ask such questions. Four of the five were excused, either peremptorily or for cause. The court asked the remaining juror to state her "feelings regarding the death penalty in terms of whether it's used too often or not often enough." This question was certainly designed to disclose bias rather than to rehabilitate. The jury selection of this case was far from fundamentally unfair.

Some of the jurors expressed the view that the death penalty was not actually carried out very often. In response to one such comment, the court

noted that some of the jurors had distinguished between the jury finding the death penalty is appropriate and the death penalty actually being applied. It explained that the jury must assume that if it comes back with a death verdict, that sentence would be imposed. "In other words," the court explained, "a juror can't simply say to themselves, well we can come back with the death penalty because it will never happen. You can't do that." Outside the presence of the jury, defendants expressed concern about the general feeling of some prospective jurors that the death penalty is rarely carried out. One of the defense attorneys said that just because the death penalty "has not been imposed in the past," he did not want the jurors "going into this proceeding thinking that it isn't going to be used." The court agreed to further admonish the jury. It asked what the defense proposed "because this is a touchy area and I want to make sure that we have an agreement as to what should be said to the jury." Counsel wanted the court to state that it "strongly believe[s] that the imposition of death sentences will commence." As a result of this discussion, the court explained to the jury panel that anything the court had said "should not in any way be construed that I believe the death penalty will not be imposed. . . . The expectation, the assumption that you need to operate from, and it's the only reasonable assumption you can make, is that if the jury at the penalty phase, if we get to the penalty phase, determines that the appropriate sentence should be the death penalty, the assumption is that it will be imposed." The jurors indicated they understood.

■ Veasley claims this admonition inadequately advised the jury panel "that any death judgment returned in the penalty phase would be carried out," and hence it improperly led the jury to "believe[] that the ultimate responsibility for determining the suitability of the defendant for execution rests elsewhere." (See *Caldwell v. Mississippi, supra,* 472 U.S. 320; *People v. Fauber* (1992) 2 Cal.4th 792, 847 [9 Cal.Rptr.2d 24, 831 P.2d 249].) He distinguishes between the term "imposed" and the term "carried out" and asserts that when the court told the jury to assume the death penalty would be "imposed," the jury would understand the court to refer only to death being the sentence, not to its being carried out. However, when the court asked defense counsel exactly what instruction they wanted, even they asked the court to tell the jury to assume the death penalty would be *imposed.* Defendants did not ask for further clarification and hence cannot complain on appeal of the court's doing what they requested. (*People v. Medina, supra,* 11 Cal.4th at pp. 743–744.) In any event, the instruction was fully adequate. The jury would clearly understand that the court was telling it to assume the death penalty would be imposed in the sense of actually being carried out, not just imposed in the sense of it being the sentence. This was the whole point of the explanation. The jury panel never expressed concern that if it returned a verdict of death, the court would impose some other sentence. Its concern was solely directed to whether a death sentence would actually be carried out.

In context, no reasonable juror would believe the court was just telling it to assume the death sentence would be imposed but not necessarily carried out.

 Finally, Veasley claims the court improperly instructed the jury panel regarding the burden of proof. The court told the jury that the burden of proof in a criminal case is beyond a reasonable doubt and not the preponderance-of-the-evidence standard of a civil trial. Later, outside the jury's presence, defense counsel expressed concern that the court did not also mention the concept of lingering doubt. The court invited them to submit an instruction on lingering doubt but they did not do so. Veasley now claims that the court should also have told the jury about lingering doubt. We disagree. The prosecution burden of proving guilt in a death penalty trial is the same as in any criminal trial—beyond a reasonable doubt. (*People v. Cooper* (1991) 53 Cal.3d 771, 846 [281 Cal.Rptr. 90, 809 P.2d 865].) Although a jury may consider lingering doubt as to guilt in its penalty decision, the court need not so instruct. (*People v. Earp* (1999) 20 Cal.4th 826, 903–904 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Sanchez* (1995) 12 Cal.4th 1, 77–78 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Contrary to Veasley's implication, the court here never suggested that the jury should disregard lingering doubt in its penalty determination. It merely made sure the jury understood that the reasonable doubt standard applied rather than preponderance of the evidence.

C. Guilt Phase Issues

1. Use of Leg Braces

At the outset of trial, the court expressed concern about courtroom security and said it would bring the matter to the bailiff's attention. One of the defense attorneys said "that's not to suggest shackling." The court stated that it had used a leg brace underneath the pants in the past. It explained that the brace was not visible to the jury, offered security to the bailiff, and did not appear to be uncomfortable. It said it had "had people sit in here with a leg brace, it's unlocked at the knee so that they can bend but they cannot run." The defense attorney said, "As long as it's not a situation where one side would want them to stand or walk or move around." The court responded, "If they take the stand," they could deal with the leg brace then. The defense attorney expressed concern that someone might ask a defendant to stand up or walk around, but otherwise none of the defendants objected to use of a leg brace. The court said it would "let the bailiff use his good judgment on that, they know the information on the people."

A short time later, the court stated, and defense counsel agreed, that it would not be "a good idea to bring the defendants out in chains in front of the jury." It proposed to "bring this to the attention of the bailiff. There's leg

braces that can be used if the sheriff believes that this is an issue of security, the leg brace is under one['s] pants, it's not something that the jury can see and the defendants will be brought in each day before the jury is placed in the jury box so that they are not going to see the leg brace."

Later in the trial, the court explained for the record the situation regarding restraints: "During the course of the trial the leg braces have been used for each of the defendants and the leg braces are . . . applied under the pants so that they are not obvious to the jury. During the course of the trial the defendants were brought out and placed in the counsel table before the jury was brought out and the jury has exited the courtroom prior to the defendants' leaving the courtroom." The court stated the leg braces were employed because of "the number of the defendants in the courtroom regarding this type of a case, the nature of the allegations that have been charged by the [P]eople and also the physical size of the defendants involved." The court added that, based on its observations, it believed the jury had not been able to determine that the defendants wore leg braces. It invited the parties to be heard on the point, but no one added anything.

Defendants argue the court erred in ordering the leg braces and improperly abdicated its responsibility to the bailiff. However, they did not object at trial to what actually occurred. One of the defense attorneys said the security should not include "shackling," and the defense attorneys wanted the court to ensure that the jury would not see the brace. But none objected to using leg braces under the pants. Accordingly, the issue is not cognizable on appeal. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Moreover, we see no prejudice. The court was understandably concerned about courtroom security given that three defendants were charged in a capital trial with a particularly violent crime. But we need not decide whether the relatively minimal restraints imposed here were justified, for any error was harmless. " 'We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury. [Citations.]' [Citation.] Even a jury's brief observations of physical restraints generally have been found nonprejudicial. [Citations.]" (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1213 [120 Cal.Rptr.2d 477, 47 P.3d 262].) Defendants speculate the jury might have observed the braces on a few occasions, but the record does not support the claim. The court specifically found that the jury had not seen the braces, and defendants did not disagree when given the opportunity to address the point. Moreover, at most, any jury observation would have been brief. The court also said it would consider what to do if a defendant chose to testify, but none did. Under the circumstances, we find no prejudice. (*Id.* at p. 1214.)

## 2. *Defendants' Absence From Proceedings*

Defendants contend they were improperly excluded from certain court proceedings. "A criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments of the federal Constitution, as well as by article I, section 15 of the California Constitution and by sections 977 and 1043 of the California Penal Code. [Citations.] A defendant, however, 'does not have a right to be present at every hearing held in the course of a trial.' [Citation.] A defendant's presence is required if it 'bears a reasonable and substantial relation to his full opportunity to defend against the charges.' [Citation.] The defendant must show that any violation of this right resulted in prejudice or violated the defendant's right to a fair and impartial trial. [Citation.]" (*People v. Hines* (1997) 15 Cal.4th 997, 1038–1039 [64 Cal.Rptr.2d 594, 938 P.2d 388]; see also *People v. Waidla, supra,* 22 Cal.4th at pp. 741–742.) Under this standard, we find no violation of defendants' right to be present.

We have reviewed each occasion defendants cite in which they were not present. Each time, defense counsel were present who were fully able to represent their clients' interests. On many of these occasions, defense counsel expressly waived their clients' presence. The Attorney General does not argue that this circumstance makes the issue not cognizable. It may be that if personal presence truly bears a substantial relation to a defendant's opportunity to defend against the charges, counsel's waiver would not forfeit the claim. However, the fact that counsel did not think defendants' presence was necessary strongly indicates that their presence did not, in fact, bear such a substantial relation. Some of these times, the defendants had simply not yet been brought into court, and the court and attorneys considered routine matters while awaiting their arrival. Sometimes there were discussions among the attorneys and court in chambers. None of the occasions involved examining witnesses or arguing to the jury.

Veasley stresses in particular two occasions. First, when the question of shackling the defendants first arose, both defendants were absent, although the court's ultimate ruling was made in their presence. Defense counsel were fully able to represent defendants' position at the first hearing and defendants were personally present at the ruling. Moreover, defendants' absence during the original discussion did not somehow make the use of leg braces prejudicial. Second, defendants were absent for certain proceedings during the jury's guilt deliberations on November 7, 1991. The events of this date are the subject of a separate contention by defendants, which we discuss below. It suffices to say at this point that defendants' personal presence would not have significantly affected the events and their absence did not prejudice them. Twice on that date, the court addressed the jury briefly in defendants'

absence. Counsel expressly waived their clients' presence both times, bolstering the conclusion that their presence was not necessary.

 Cleveland cites an occasion on which his attorney stipulated that certain medical records could be admitted into evidence without having to call a custodian of records. His attorney waived Cleveland's presence for this stipulation and stated he had the "express authority" to do so. Again, the fact that Cleveland's attorney believed his presence not necessary supports the conclusion that his presence was, in fact, not necessary. Counsel has authority to stipulate to evidentiary matters, including the admission of medical records. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 376 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Cleveland's presence was not necessary for this purpose. Cleveland also cites a brief occasion outside the jury's presence when the court expressed concern that the "defendants appear to be rolling prisoners in custody" and suggested the sheriff "take additional precautions regarding mixing the defendants with other prisoners." This colloquy resulted in no rulings or other actions relevant to the trial. Cleveland suggests the court's concern might have affected its denial of the automatic motion to modify the death judgment. However, at the hearing on that motion, the court understood and performed its duty to base its decision solely on the evidence presented at trial. Moreover, the reference to "rolling prisoners" was to the defendants in general, not Cleveland specifically. The fact the court granted the modification motion as to Charan demonstrates that this concern did not affect its decisions.

Cleveland also cites events on November 22, 1991, during the jury's penalty deliberations as to Cleveland and Charan, in which the court received, and the attorneys considered, a note from the jury "regarding matters that they believe should be considered as intimidation or possible intimidation." After discussing the question with the attorneys, the court told the jury "that the matters addressed in the notes are simply coincidental." The jury assured the court that the matter would not affect its deliberations. The attorneys waived defendants' presence for this purpose, and the court told the jury that normally the defendants would be present, but the "lawyers and I thought that it would probably be best to handle this in a little bit more informal context." Again, Cleveland's presence on this occasion was not necessary to defend fully against the charges.

In short, defendants were present whenever their presence bore any substantial relation to their ability to defend fully against the charges.

### 3. *Confidential Marital Communication Privilege*

 At the time of the crimes, Peterson and Veasley were married. Accordingly, Veasley asserted the confidential marital communication privilege

of Evidence Code section 980, which provides, subject to exceptions not relevant here, that one spouse may prevent another spouse from disclosing a communication that "was made in confidence between him and the other spouse while they were husband and wife." At trial, the court and parties were aware of this privilege, and the district attorney did not offer into evidence certain communications between Veasley and Peterson that came within it. The most important such communication, for example, was Veasley's statement to Peterson that he personally shot the victims. Because this statement was inadmissible against Veasley, the court bifurcated the penalty trial to permit Cleveland and Charan to present it in mitigation after the jury had reached its verdict as to Veasley. Nevertheless, Veasley contends the privilege was violated in three respects.

First, Veasley objected to Peterson's testimony that when he returned to her home the evening of the murders she observed him wearing a watch and possessing cocaine. After consulting a prominent treatise, the court admitted the testimony. Veasley contends that Peterson's observations were, in effect, confidential communications between him and her. We disagree. As explained in the book the court consulted, "the privilege applies only to oral or written verbal expression from one spouse to the other, and acts of the spouses committed in each other's presence do not constitute *communications* between them, within the meaning of the privilege for confidential marital communications." (2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 2d ed. 1982) Privilege for Confidential Marital Communications, § 36.2, p. 1348; see also 2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. Mar. 2002 supp.) § 36.21, p. 811; *People v. Bradford* (1969) 70 Cal.2d 333, 342, fn. 2 [74 Cal.Rptr. 726, 450 P.2d 46] [acts of placing cans in garage and giving wife the victim's jewelry "are not 'communications' within the meaning of the privilege"]; *People v. Dorsey* (1975) 46 Cal.App.3d 706, 717 [120 Cal.Rptr. 508] ["[T]he privilege encompasses only communications between husband and wife during marriage. It does not extend to physical facts which are observed, which do not constitute 'communications' "].) Veasley claims he showed or displayed the cocaine to Peterson in confidence, but she merely testified that she observed it in his possession. Substantial evidence supports the court's finding that the observations were not confidential marital communications. (*People v. Mickey* (1991) 54 Cal.3d 612, 654 [286 Cal.Rptr. 801, 818 P.2d 84].)

Second, Peterson testified without objection on direct examination that a couple of weeks before the murders, Veasley told her that he was at the All Star Inn to meet Nelson. Later, in redirect examination, Veasley objected to similar testimony. After the prosecutor noted that it was "already on the record," the court overruled the objection. Veasley now claims this testimony violated the confidential marital communication privilege. The issue is not cognizable on appeal because he did not object when she first testified about

the statement. (*People v. Morris* (1991) 53 Cal.3d 152, 187–188 [279 Cal.Rptr. 720, 807 P.2d 949].) Veasley claims counsel was ineffective for not objecting. However, the evidence appears to have been admissible. "To make a communication 'in confidence,' one must intend nondisclosure . . . ." (*People v. Mickey, supra*, 54 Cal.3d at p. 654.) "While a communication between a husband and wife is presumed to be confidential, if the facts show that the communication was not intended to be kept in confidence, the communication is not privileged." (*People v. Gomez* (1982) 134 Cal.App.3d 874, 879 [185 Cal.Rptr. 155]; see Evid. Code, § 917, subd. (a).) Here, the communication was innocuous when made, and no reason appears for Veasley to have wanted it kept in confidence. Later, he told others in Peterson's presence that he had previously dealt with Nelson at that motel, and he told Detective Moore that he had been at the All Star Inn. The facts show Veasley did not intend to keep this communication confidential.

Third, during redirect examination, the prosecutor asked Peterson why she waited until December 1990 before talking with law enforcement officials. She responded, "I didn't believe Mr. Veasley that the murder had been committed." Veasley objected to the statement. The court sustained the objection and instructed the jury to disregard the response. Later, Veasley moved for a mistrial because of the response. The court denied the motion, noting that there was "ample evidence here for the jury to infer that her belief is not based on any statement by Mr. Veasley, but her belief . . . came about through certain observations and through other statements that were received into evidence." Veasley contends Peterson's statement violated the confidential marital communication privilege. However, the court sustained his objection, so the statement was never admitted. To the extent Veasley claims the court should have granted a mistrial, we disagree. The court acted within its discretion in denying a mistrial. (*People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) Peterson did not specify what she had heard from Veasley. The jury properly heard evidence that before the murders, Veasley and the others talked about the crime in front of Peterson and implied that they intended to kill the victim. Later Peterson heard Veasley make comments to another person indicating his involvement in the crime. The court reasonably concluded it was unlikely the jury would assume Peterson's statement related to evidence it had never heard rather than the evidence it did hear.

### 4. *Denial of Mistrial Motion*

The defense attorneys cross-examined Peterson about the fact that Veasley did not live at her home even though they were married, and that she knew Veasley was involved with other women. Specifically, Veasley's attorney elicited that Peterson had earlier stated that "because of his business he had to

spend nights elsewhere." A short time later, he asked, "And your statement is that he was residing [somewhere else] because of his business?" She responded, "Yes, that's what he told me." Counsel then asked, "Well isn't it true that you knew that Mr. Veasley was . . . having a relationship, a boyfriend/girlfriend relationship with [a certain person]?" She responded that she did know that. Counsel asked further questions about her knowledge about Veasley's "womanizing" and whether it upset her. He asked whether it presented "a problem that [Veasley] was not spending nights with you and the family?" She responded that it was not a problem. Counsel then elicited again that she knew about the other women and again asked whether this knowledge caused her problems. The obvious purpose of this cross-examination was to challenge Peterson's credibility by suggesting that Veasley lived elsewhere because of his "womanizing" rather than his "business," and that she was jealous and hence biased against Veasley.

On redirect examination, the district attorney directed Peterson's attention to this line of questioning and elicited that Peterson had several times said Veasley was living elsewhere "because of his business." She then asked what that business was. Peterson responded, "Selling drugs." The district attorney asked why this business caused Veasley to live elsewhere. Veasley's attorney objected on grounds of "speculation" and "lack of foundation." The court overruled the objection, and Peterson responded, "In late August, I caught our then six, seven-month-old baby chewing on a bag of cocaine, so when Mr. Veasley came home, he was told he had to leave." Later, Veasley moved for a mistrial due to this testimony, arguing that it was inflammatory and irrelevant. The district attorney argued that the questions were in response to the cross-examination about why Veasley was living elsewhere and whether Peterson was jealous of his girlfriends. The court denied the mistrial motion.

Veasley argues the court erred in denying a mistrial. The Attorney General contends the claim is not cognizable because Veasley objected to the redirect examination solely on grounds of speculation and lack of foundation rather than relevance or undue prejudice. However, Veasley presents the issue as error in denying the mistrial motion, a motion he did make. On the merits, the court acted within its discretion in denying the motion (*People v. Delgado, supra,* 5 Cal.4th at p. 328), because the questioning was proper redirect examination. "The extent of the redirect examination of a witness is largely within the discretion of the trial court." (*People v. Kynette* (1940) 15 Cal.2d 731, 752 [104 P.2d 794].) On cross-examination, the defense created the impression that Veasley was living apart from Peterson because of his "womanizing" and suggested that this made her a biased witness. Without context, her protestations that he was living separately only because of some unspecified "business" might appear disingenuous, which would cast doubt on her credibility. It was thus appropriate for the district attorney to supply the context and ask what the business was and why it caused Veasley to live

separately. Redirect examination's "principal purposes are to explain or rebut adverse testimony or inferences developed on cross-examination, and to rehabilitate a witness whose credibility has been impeached." (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 256, p. 328.) This redirect examination properly fulfilled these purposes.

### 5. Alleged Ineffective Assistance of Counsel

Because Peterson was a very important witness, all three defense attorneys, including Veasley's attorney, cross-examined her at length and on many subjects. Veasley claims his attorney's cross-examination was "inept" and deprived him of effective assistance of counsel because it elicited damaging redirect examination. We disagree.

On cross-examination, Veasley's attorney elicited that Peterson had called the police on three occasions to have him arrested, but the calls resulted in only one actual arrest for abusing her. One of the times, she called the police about crimes Veasley and other members of a community college basketball team had allegedly committed. When the coach of the team confronted her about it, she denied being the one who made the call. On redirect examination, the district attorney questioned Peterson about these events. Over objection, she testified that on the one occasion resulting in Veasley's arrest, he beat her up in the kitchen and "tried to drown me in the kitchen sink." She also explained she was not the one who actually called the police.

To demonstrate ineffective assistance of counsel, defendant must show both that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. (*People v. Williams* (1997) 16 Cal.4th 153, 214–215 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Although in extreme circumstances cross-examination may be deemed incompetent (*In re Jones* (1996) 13 Cal.4th 552, 570–571 [54 Cal. Rptr. 2d 52, 917 P.2d 1175] [eliciting devastating evidence against the defendant on cross-examination without adequate investigation and for no possible tactical reason]), normally the decision to what extent and how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make. (*People v. Williams, supra,* at pp. 216–217.) "Even where defense counsel may have ' "elicit[ed] evidence more damaging to [the defendant] than the prosecutor was able to accomplish on direct" ' [citation], we have been 'reluctant to second-guess counsel' [citation] where a tactical choice of questions led to the damaging testimony." (*Id.* at p. 217.) Here, a tactical choice readily appears. The cross-examination tended to show that Peterson repeatedly called the police about Veasley, but the calls resulted in only one arrest. This

both suggested that Peterson was in the habit of falsely accusing him of criminal conduct and cast doubt on whether he would actually talk in front of her about other crimes he had committed or would commit.

Rigorous cross-examination risks eliciting damaging redirect examination. Whether to run that risk is a tactical choice counsel must be permitted to make. Moreover, here the damaging testimony came only from the same witness the defense necessarily was attempting to discredit. The defense necessarily tried to portray Peterson as falsely implicating Veasley, as well as the other defendants, in these crimes. No reason appears for counsel to fear that her brief testimony regarding the incident of domestic violence would be more credible than her testimony regarding the charged crimes; thus, it was highly unlikely the jury would disbelieve Peterson regarding the charged crimes, but still convict Veasley of murder because it believed her testimony regarding the domestic violence. (See *People v. Riel, supra,* 22 Cal.4th at p. 1186.)[6]

### 6. *Alleged Prosecutorial Misconduct*

Cleveland claims the prosecutor committed various acts of misconduct. However, he objected to none at trial. Contrary to Cleveland's argument, nothing in the record suggests an objection would have been futile. Because an objection could easily have cured any harm, the current claims are not cognizable on appeal. (*People v. Riel, supra,* 22 Cal.4th at pp. 1196–1197.)

Moreover, the record discloses no misconduct. Cleveland claims the prosecutor improperly suggested that he was the actual shooter when she knew—because of Veasley's admission to Peterson, which was inadmissible at the guilt phase—that Veasley was the shooter. Veasley's statement certainly suggested he was the actual shooter, but it was not conclusive proof. As the prosecutor noted outside the jury's presence, although Veasley told Peterson he shot each victim twice in the head, the evidence showed that each victim was shot more than two times. But more importantly, the prosecutor never suggested that Cleveland was the shooter. Rather she argued and presented evidence—including, as Cleveland notes, evidence of motive and consciousness of guilt—that he was *guilty of the murders,* which is quite a different matter. Each of the defendants could be guilty of these murders whether or not he was the actual shooter. (*People v. McCoy, supra,* 25 Cal.4th at pp. 1116–1117.) Indeed, the prosecutor argued to the jury that "it would be pretty difficult to say who the actual shooter is. The evidence is not there who

---

[6] To the extent Veasley claims counsel's actions prejudiced him at the penalty phase, we note that evidence of crimes of violence against Peterson would have been admissible against him at that phase as evidence of criminal activity involving force or violence. (§ 190.3, factor (b).)

the actual shooter is. You can make some conjectures, you have your own theories based on what the evidence is but there is no actual complete and uncontroverted evidence as to who the actual shooter is." The prosecutor also correctly told the jury that, as to guilt, who the actual shooter was "doesn't matter. It doesn't matter which one of them pulled the trigger." The prosecutor properly argued that Cleveland was guilty of the murders.

Cleveland also claims the prosecutor improperly "coerced" Valles, the victim of the robbery earlier on the day of murders, into testifying. The prosecutor did, in fact, use the subpoena power and court process to coerce Valles into testifying, but doing so was proper. Parties in judicial proceedings routinely coerce witnesses into testifying through the subpoena power and court process. Valles was a reluctant witness. Although he apparently cooperated at the preliminary hearing, at trial he initially failed to appear despite being under subpoena. At one point when he was in the courtroom, he attempted to leave and the bailiff had to stop him. The district attorney stated for the record that Valles had moved out of the state. He had "indicated his reluctance to be here at all. He's been cajoled into coming to court. He has always told me he did not want to testify." Accordingly, the court remanded him into custody to ensure he would be available to testify. Eventually, Valles did testify, as any witness may be *required* to do.

Cleveland also claims the prosecutor improperly coerced Valles into testifying favorably to the prosecution. Valles did not identify his assailants. He also initially denied having the nickname Chuey, although he eventually admitted that he was called that at one time, after the prosecutor confronted him with his previous inconsistent statements. Contrary to Cleveland's assertions, the record does not suggest in the slightest that the prosecutor coerced Valles into testifying in any particular way, or that she somehow implied that Valles's failure to identify anyone was in fact an identification. Rather, she forced him to testify, as was her right through exercise of the subpoena power, and examined him according to the rules of evidence. Although Valles did not identify anyone in court, his testimony, including admitting to the nickname Chuey, was highly relevant, as it corroborated Peterson's testimony.

Cleveland also claims the prosecutor misstated Valles's testimony in her argument to the jury. She did not do so. She noted, correctly, that "the little bit that he said" corroborated other evidence about the incident. Later, she argued, "when he's shown a photo line up . . . he says tentatively that the one looks like the guy who grabbed him or the guy that was behind him and the person he pointed out was defendant Cleveland." This argument was also reasonably based on the evidence. Although Valles identified no one at trial, he testified (reluctantly) that he had selected a photograph, apparently of Cleveland, from a lineup as looking like one of the assailants, although he could not say for sure.

### 7. *Jury Instructions*

Cleveland argues the court committed several errors in instructing the jury.

The court gave certain preinstructions to the jury at the outset of trial, including one on unjoined perpetrators, as follows: "The next instruction has to do with unjoined perpetrators of the same crime, and I expect the evidence will establish there's a person who may be mentioned here who's not here in court. And it reads as follows: 'There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant'—in this case, defendants '—are on trial. Do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he or she has or has been or will be prosecuted.' " (See CALJIC No. 2.11.5.) Later, after the preinstruction had ended and testimony had begun, defendants objected to the word "establish" and argued the court should instead have used the word "suggest." They moved for a mistrial, which the court denied.

Cleveland argues the court improperly expressed an opinion on the evidence. (See generally *People v. Rodriguez* (1986) 42 Cal.3d 730, 766–767 [230 Cal.Rptr. 667, 726 P.2d 113].) The Attorney General argues the issue is not cognizable because defendants did not object in a timely fashion. We disagree. "Even without an objection, a defendant may challenge on appeal an instruction that affects 'the substantial rights of the defendant . . . .' (§ 1259.)" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 505–506 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Cleveland argues that the instruction was a "judicial endorsement of the prosecution theory and of the defendant's guilt." If he were correct (as we explain, he is not), the instruction would have affected his substantial rights, thus not requiring an objection. (*Id.* at p. 503.)

On the merits, we see no error. The court did not endorse any theory of the case and did not indicate a belief in defendants' guilt. It merely told the jury it expected the evidence to establish that someone else may be mentioned who was not in court, and that it should not draw meaning from the fact that person was not in court. In fact, Peterson did mention a brother of Cleveland who might have been involved in the crimes but was not in court. The court did not comment on the credibility of any particular witness. Indeed, as part of the same preinstruction, the court told the jury: "I have not intended by anything I have said or done . . . to suggest what you should find the facts to be, or that I believe or disbelieve any witness. If anything I have done or said has seemed to so indicate you will disregard it and form your own conclusion." The court gave similar instructions at the end of the trial. It is not reasonably likely the jury understood the court to be endorsing any particular theory of the case or defendants' guilt. (*People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

The court gave the standard instruction regarding motive.[7] Cleveland argues the instruction was erroneous in two respects. The Attorney General counters that, because defendants not only failed to object to the instruction but actually requested it, the issue is not cognizable. As we explain, we agree in part.

 Cleveland argues the motive instruction "shifted the burden of proof to imply that [he] had to prove innocence." This issue is cognizable despite the failure to object because if Cleveland were correct, the instruction would have affected his substantial rights. But the instruction did not shift the burden of proof. It merely told the jury it may consider the presence or absence of motive. (*People v. Estep* (1996) 42 Cal.App.4th 733, 738–739 [49 Cal.Rptr.2d 859]; *People v. Wade* (1995) 39 Cal.App.4th 1487, 1497 [46 Cal.Rptr.2d 645]; see also *People v. Nakahara* (2003) 30 Cal.4th 705, 714 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Frye* (1998) 18 Cal.4th 894, 958 [77 Cal.Rptr.2d 25, 959 P.2d 183].) The motive instruction did not itself include instructions on the prosecution's burden of proof and the reasonable doubt standard, but it also did not undercut other instructions that correctly informed the jury that the prosecution had the burden of proving guilt beyond a reasonable doubt.

Cleveland also argues that because the motive instruction, unlike the court's instruction on attempts to suppress evidence, did not specifically say that evidence of motive alone is insufficient to prove guilt, it implied that such evidence alone may be sufficient. We find this claim not cognizable. This argument merely goes to the clarity of the instruction. "A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse, supra,* 27 Cal.4th at p. 503.) If defendants had thought the instruction should be clarified to avoid any implication that motive alone could establish guilt, they should have so requested. They did not. (*Id.* at p. 504.) We also find no error and no prejudice. The court fully instructed the jury on the reasonable doubt standard. We find no reasonable likelihood the jury would infer from the motive instruction that motive alone could establish guilt. Moreover, given the strong evidence of guilt aside from motive, the jury certainly did not base its verdicts solely on motive.

 Cleveland reiterates other arguments we have already rejected. Instructions on circumstantial evidence and evidence of mental state, including

---

[7] "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt; absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled." (See CALJIC No. 2.51.)

use of the word "appears," did not undermine the reasonable doubt standard or create an impermissible mandatory presumption of guilt. (*People v. Hillhouse, supra,* 27 Cal.4th 'at p. 504; *People v. Crittenden, supra,* 9 Cal.4th at p. 144.) ■ Instructions that contain the word "innocence" or "innocent" do not suggest that a defendant has the burden of establishing innocence. (*People v. Frye, supra,* 18 Cal.4th at p. 958.) ■ The instruction on willfully false witnesses (CALJIC No. 2.21.2) does not reduce the prosecution's burden of proof. (*People v. Riel, supra,* 22 Cal.4th at p. 1200.) Cleveland argues that the standard instruction on weighing conflicting testimony (CALJIC No. 2.22) also undermines the reasonable doubt standard. ■ We said long ago that this instruction must be given sua sponte in every criminal case in which conflicting testimony has been presented. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884–885 [123 Cal.Rptr. 119, 538 P.2d 247].) We have apparently not yet confronted an argument that this instruction somehow undermines the reasonable doubt instruction, but it does not do so any more than the other instructions that have already been challenged on this basis. "The instructions as a whole correctly instructed the jury on the prosecution's burden of proof." (*People v. Riel, supra,* 22 Cal.4th at p. 1200.) ■ Finally, contrary to Cleveland's argument, the court did not have to tell the jury it must unanimously agree on the theory of guilt of first degree murder. (*People v. Carpenter, supra,* 15 Cal.4th at pp. 394–395.) Moreover, the jury convicted each defendant of robbing both victims and found true a robbery-murder special circumstance, thus showing at least that the jury unanimously found the felony-murder rule applied. (*Id.* at p. 395.)

### 8. *Alleged Interference With Jury Deliberations*

During its guilt deliberations, the jury asked the court questions regarding the verdict forms. Defendants contend the court's responses and other actions improperly interfered with the jury's deliberations. We disagree. The court merely clarified some points of confusion and then permitted the jury to continue its deliberations.

#### a. *Factual Background*

■ In June 1990, a few months before the crimes in this case, the voters approved Proposition 115, which made substantive changes in felony-murder special-circumstances provisions, including amending subdivision (b) and adding subdivisions (c) and (d) to section 190.2. (*Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 981, 986–987 [9 Cal.Rptr.2d 102, 831 P.2d 327].)[8]

---

[8] Subdivisions (b), (c), and (d) of section 190.2 read substantially the same today as they did under Proposition 115. Today they provide: "(b) Unless an intent to kill is specifically required under subdivision (a) for a special circumstance enumerated therein, an actual killer, as to whom the special circumstance has been found to be true under Section 190.4, need not have

Before these amendments, for a felony-murder special circumstance to apply, the defendant had to either be the actual killer or intend to kill. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) Under Proposition 115, a person other than the actual killer is subject to the death penalty or life without parole if that person was a major participant in the underlying felony (here robbery) and *either* intended to kill *or* acted with reckless indifference to human life. (See *People v. Estrada* (1995) 11 Cal.4th 568, 572 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) At the time of trial, these provisions—including the reckless indifference to human life provision— were fairly new, and the court and parties had to devise a verdict form for this new version of the robbery-murder special circumstance.

The verdict form that the court originally gave the jury included three questions to which the jury was to answer true or not true. The first question was whether the murder was committed under the robbery-murder special circumstance. The second was whether the defendant was the actual killer. The third was whether the defendant was "either the actual killer or an aider and abettor who either intended to kill a human being or aid another in the killing of a human being or with reckless indifference to human life and as a major participant aided and abetted the commission of the crime of robbery which resulted in the death of a human being." The court instructed the jury, "If you find that a defendant was not the actual killer of a human being *or if you are unable to decide whether the defendant was the actual killer*, you cannot find the special circumstance true as to that defendant" unless it found true the third question on the verdict form. (Italics added.) But the original verdict form itself did not state what the jury should do it if could not decide the second question unanimously.

During the guilt deliberations, the jury sent the court a note asking, "Is a unanimous decision required for all parts of special circumstance verdict?"

had any intent to kill at the time of the commission of the offense which is the basis of the special circumstance in order to suffer death or confinement in the state prison for life without the possibility of parole.

"(c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4.

"(d) Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

As relevant here, section 190.2, subdivision (a)(17), makes murder in the commission of robbery a special circumstance.

After discussion with the parties, the court answered the question, "Yes." The foreperson of the jury indicated there was some confusion between the instructions and the verdict form. The court told the jury that if it was still confused, it should go back into the jury room and submit a new question. The jury resumed its deliberations. Thereafter, out of the jury's presence, the court and parties discussed the jury's concern further. The district attorney suggested the jury might have been confused as to what it should do if it could not answer the second question unanimously. The district attorney suggested, and the court agreed, that the jury should be told that if it found the defendant was not the actual killer or was unable to decide the question unanimously, it should proceed to the third question. The court stated, "It seems clear to me now that I reviewed that verdict form that should have been included initially." But the court took no further action pending further questions from the jury.

The next day, November 7, 1991, the district attorney expressed concerns out of the jury's presence about a then recent Court of Appeal decision that had held that Proposition 115's amendments to section 190.2 were ineffective. At that time, this court had granted review in the case but had not yet decided it. (See *Yoshisato v. Superior Court, supra,* 2 Cal.4th 978.) The district attorney was concerned that if the Court of Appeal's view prevailed, the verdict might later be invalidated. She suggested the verdict form be changed to require the jury to find an intent to kill before it found true the felony-murder special circumstance. The court told the jury to suspend deliberations while it considered the matter. It reviewed the Court of Appeal opinion, noted that it was not binding because this court had granted review, and disagreed with it. It anticipated (correctly, see *Yoshisato v. Superior Court, supra,* 2 Cal.4th 978) that we would overturn the Court of Appeal's judgment and hold that Proposition 115's amendments to section 190.2 were effective. Accordingly, it took no action on the district attorney's request and permitted the jury to resume deliberating.

The jury then asked the court another question: "When rendering a decision for 'verdict special circumstance' which provides for three findings (true or not true), and assuming a unanimous decision was rendered for the first finding, would it be acceptable to leave the second and third finding blank without negating the first finding and, therefore, the overall verdict?" The court and parties conferred on how to respond. With the agreement of everyone, including defendants, the court instructed the jury that if it was unable to agree on the second question, it should leave it blank and go on to the third question. The foreperson asked another question. The court did not want to answer a new question at that point without carefully considering it. It told the jury to resume deliberations and to ask further questions in writing if it had any. The jury then resumed deliberations. Later, the court told the parties it intended to call the jury back and ask if it had further questions.

Counsel for Cleveland objected that doing so in the absence of further questions from the jury "would be invading the province of the jury." The other two defense attorneys submitted the matter without comment. The court called in the jury and asked if it had another question. The foreperson said the jury might have one. The court then excused the jury for the day, six minutes earlier than the normal time the jury stopped deliberating. The court suggested that if the district attorney wished to have a new, clearer verdict form, she should prepare one for the next day.

The next morning, the jury did not resume deliberations immediately. The court and parties conferred to discuss possible new verdict forms. At the district attorney's request, and over defendants' objections, the court decided to give the jury the new forms. The court ascertained from the foreperson that the jury "had a problem with the verdict form as presented in reference to the special circumstances concerning murder in the commission of robbery." Because of that concern, and because it found that the original verdict form "was inartfully drafted," it told the jury it would substitute a new verdict form. It instructed the jury that "the fact that I am giving you a new verdict does not mean on my part that any of the verdict forms necessarily apply to any of the defendants, that's for the jury to determine." It gave the jury the new forms and told it to resume deliberating. The new form stated, "If you are unable to unanimously agree that the defendant was the actual killer, you may leave the answer to the question in paragraph 2 blank"; and "If you have answered the question in paragraph 2 'not true' or you left it blank, then proceed to the question in paragraph 3." The jury resumed deliberating at 9:48 a.m. that morning.

After the jury resumed deliberations, Cleveland moved for a mistrial based on these events. The court denied the motion. The jury reached its verdict later that day. It found not true that Veasley or Charan was the actual killer and left the question blank as to Cleveland. It found the third question true as to all three defendants.

### b. *Analysis*

Defendants contend the court improperly and prejudicially interfered with the jury's deliberations. As to Veasley, except for the contention that the court should not have supplied a new verdict form, the issue is not cognizable on appeal. Veasley did not otherwise object to the court's actions. (*People v. Cash* (2002) 28 Cal.4th 703, 730 [122 Cal.Rptr.2d 545, 50 P.3d 332].) Veasley contends his attorney was ineffective for not objecting. However, competent counsel may reasonably decline to object to the court's responding to questions from the jury and suspending deliberations while it considers what to do with an appellate court decision that has invalidated part of the legal basis on which the prosecution against his client is proceeding.

In any event, we see no error. Section 1138 provides that when, after it has begun deliberating, the jury "desire[s] to be informed on any point of law arising in the case, . . . the information required must be given . . . ." (See *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].) This provision imposes on the court the "primary duty to help the jury understand the legal principles it is asked to apply." (*Ibid.*) The court fulfilled this duty. The jury sought the court's advice on a matter about which it was confused. It was clearly having difficulty deciding which defendant was the actual shooter, which was understandable given the absence of evidence on the point. It was uncertain whether it had to decide that question unanimously and how it should proceed if it could not do so. The court clarified the point in a way everyone, including defendants, agreed on. It instructed that if the jury could not decide whether a defendant was the actual killer it should leave the second question blank and move on to the third question. This instruction was correct, as the jury could validly find true the robbery-murder special circumstance without determining whether any particular defendant had been the actual killer.

 Eventually, to make matters as clear for the jury as possible, the court substituted new verdict forms that explained the correct procedure precisely. Contrary to defendants' argument, the court did not coerce the jury in the slightest. Indeed, when it supplied the new verdict form, it carefully reiterated that whether any of the forms applied to any defendant was solely for the jury to determine. Thus, the court did not "interfere" with the jury's deliberations; it provided guidance when the jury requested it.

Cleveland argues that the special questions on the verdict form were not required, and they prejudiced him because the jury eventually found not true that Veasley or Charan was the actual killer but did not decide the question as to him. But whether the questions were *required*, merely asking them was not error. (See *People v. Davis* (1995) 10 Cal.4th 463, 511–512 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Indeed, all the parties agreed to them at trial. We also see no prejudice regarding either the guilt or penalty determination. At most, the verdict showed uncertainty at the guilt phase whether Cleveland was the actual killer. But the *evidence*, not the verdict form, created the uncertainty. Moreover, the actual killer's identity was irrelevant to the guilt verdict. At the penalty phase, Cleveland was permitted to present additional evidence (not admissible earlier) that suggested he was not the actual killer.

 Defendants also argue that the court's suspending deliberations was itself coercive and prejudicial. It was neither. The court acted cautiously in deciding how to respond to the jury's questions and what to do about the appellate court decision, and properly so. In a capital trial especially, the court should proceed cautiously. It properly suspended the deliberations

briefly to consider important legal issues and make sure the jury was correctly instructed, and then permitted the jury to resume deliberations. Ultimately, a correctly instructed jury rendered an uncoerced verdict finding true as to each defendant both the robbery-murder special circumstance and all of its necessary predicate facts. The court did not err during deliberations.[9]

## D. Penalty Phase Issues

### 1. Bifurcating Penalty Trials

Peterson said that Veasley told her that he had forced Nelson and Hunter to lie on the floor with their hand behind their backs and then he shot them each twice in the head. Because of the confidential marital communication privilege, this evidence was inadmissible against Veasley (Evid. Code, § 980), but Cleveland and Charan wanted to introduce it in mitigation at the penalty phase to try to show that they were not the actual shooters. In order to protect Veasley from having this evidence admitted against him and to allow Charan and Cleveland to present the evidence on their behalf, the trial court bifurcated the penalty trial. The penalty trial against Veasley went first without the jury hearing this evidence. After the jury reached its verdict as to Veasley, the penalty trial against Cleveland and Charan was held before the same jury, at which time it heard Peterson's testimony.

The court explained the process to the jury at the outset of the first penalty trial: "If you notice we have Mr. Veasley only today and the other two defendants not here. We've bifurcated the penalty phase. The first part will be as to Mr. Veasley only and then you will go out and deliberate, reach verdicts if you can reach a verdict on that and then we will have the penalty phase as to Mr. Charan and Mr. Cleveland after that. You're not to speculate as to why we're following this procedure, that is—those are legal issues for this court to determine, not to wonder why at all as to why we're only proceeding against Mr. Veasley today."

Veasley and Cleveland argue the bifurcation was prejudicial error, although, because each was affected differently, for different reasons.

### a. Veasley's Argument

 The only effect the trial court's ruling had on Veasley was to sever his penalty trial from that of Cleveland and Charan. Because his trial was first, the second penalty trial could not have affected him. Veasley argues the

---

[9] Veasley argues that the cumulative effect of the alleged errors was prejudicial as to guilt. However, there was virtually no error to accumulate.

ruling was error. The issue is not cognizable as to Veasley because he never objected. It is settled that a defendant must request severance or object to joinder to complain on appeal of the failure to sever. (*People v. Champion* (1995) 9 Cal.4th 879, 906 [39 Cal.Rptr.2d 547, 891 P.2d 93].) The same rationale applies to the reverse situation, i.e., the failure to object to severance. (See *People v. Saunders, supra,* 5 Cal.4th at pp. 589–590.) If, for some reason, Veasley had wanted to be tried with the other two defendants at the penalty phase, he should have so requested at trial. He did not, so he cannot complain on appeal of the court's action. Veasley argues that counsel was ineffective for not objecting to the severance. However, no reason appears for counsel to believe severance was against Veasley's interests. Indeed, criminal defendants usually complain of the trial court's *denial,* not granting, of severance. (E.g., *People v. Champion, supra,* 9 Cal.4th at pp. 904–906.)

We also see no error or prejudice from Veasley's perspective. His statement to Peterson about shooting the victims was never used against him. He argues that severance was not required to protect Cleveland's and Charan's legitimate interests. But the question here is not whether the court was *required* to order severance, but whether it erred in doing so. We see no abuse of discretion. (*People v. Alvarez, supra,* 14 Cal.4th at p. 189.) Ordering severance to permit Cleveland and Charan to present Peterson's testimony seems reasonable. Veasley also claims that the bifurcation "was a surprise to the jury" and caused it to "return a death verdict against Veasley as a means of ensuring at least one of the defendants paid the ultimate price for the deaths of Nelson and Hunter." We disagree. At the outset of the penalty trials, the court explained to the jury what was occurring. The explanation was neither difficult to understand nor one that would particularly trouble the jury. The jury knew that the separate penalty trial as to Cleveland and Charan would follow. No reason appears to believe that the severance increased the likelihood the jury would impose the death penalty against Veasley.

### b. *Cleveland's Argument*

Because Cleveland's penalty trial followed Veasley's, Cleveland's argument is quite different. As with Veasley, the bifurcation had the effect of severing the penalty trials. Because Cleveland originally requested severance, he cannot and does not complain of this circumstance. But the bifurcation had an additional impact on Cleveland. His penalty trial was held in front of, and the penalty decision was made by, the jury that had already heard the penalty proceeding and made the penalty decision as to Veasley. Cleveland argues that this circumstance denied him a fair trial before an impartial jury. After the guilt verdict, Cleveland agreed to the bifurcation. Nevertheless, we find the current contention cognizable. Cleveland had originally moved to sever

the trials. Cleveland agreed to the bifurcation only after the court denied that motion. He obviously believed bifurcation was preferable to the jury's never hearing Peterson's testimony, but his original severance motion would have given him his own jury rather than a jury that had already considered the penalty question as to Veasley. Accordingly, we consider his arguments on the merits.

No statutory provision specifically permits this procedure. However, in the context of deciding what to do when one defendant has made an out-of-court statement implicating another defendant, we have held that procedures (in addition to severing the trials or redacting or excluding the out-of-court statement) may be used to avoid prejudicing the nondeclarant defendant "if they serve the same purpose and do not prejudice the defendants." (*People v. Harris* (1989) 47 Cal.3d 1047, 1071 [255 Cal.Rptr. 352, 767 P.2d 619].) We have upheld the use of two juries in the same trial, one for each defendant, with one jury excluded when evidence is presented that is inadmissible as to that jury's defendant. (*Id.* at pp. 1070–1076; see also *People v. Fletcher, supra,* 13 Cal.4th at p. 468.) Here, the court did not use two juries but a single jury in consecutive penalty trials. "The sole question here is whether the procedure utilized in this case ensured defendant a fair trial at which his fundamental constitutional rights were protected." (*People v. Harris, supra,* at p. 1071.) As we explain, courts should be very cautious about adopting the procedure used here, but the bifurcation was fair to Cleveland in the unusual circumstances of this case.

We have recognized, again in the context of deciding what to do when one defendant has made an out-of-court statement implicating another defendant, that one "alternative that has been suggested, but apparently never used in this state, is a joint but bifurcated trial in which the jury first determines the guilt of the nondeclarant defendant, then receives evidence of the nontestifying codefendant's extrajudicial confession, and finally proceeds to determine the guilt or innocence of that defendant." (*People v. Fletcher, supra,* 13 Cal.4th at p. 468, fn. 5.) We also cautioned, however, "that federal appellate courts have reversed convictions of defendants whose guilt has been determined in a bifurcated trial, concluding that it may be practically impossible for a jury to determine one defendant's guilt without impermissibly prejudging the guilt of another defendant jointly tried. (See, e.g., *United States v. McIver* (11th Cir. 1982) 688 F.2d 726, 729–730.)" (*Ibid.*) Cleveland urges a similar conclusion here, arguing that "the jury could not reasonably keep from applying the arguments presented during Veasley's penalty phase" to him. We disagree. Bifurcating the *penalty* decision in this case was different from bifurcating a *guilt* determination.

In *United States v. McIver, supra,* 688 F.2d 726, the trial court bifurcated the guilt trials to permit one defendant to present evidence favorable to that

defendant but not admissible against the other two defendants. The prosecution presented its evidence against all the defendants, and then two of the defendants presented their defense. At that point, the jury deliberated and found those two defendants guilty. After that the third defendant presented his defense and questioned some of the witnesses the prosecution had called in the first phase. The jury then deliberated again and found the third defendant guilty. (*Id.* at p. 728.) The appellate court concluded the bifurcated trial "violates the Sixth Amendment because the jury might consider, even if inadvertently, the guilt of the defendant before it has heard the defendant's case. Here the three defendants were all charged with the same crimes. *The government's evidence presented during the [first two defendants'] phase of the trial pertained to all three defendants.* It is unlikely in such a situation that the jury could convict two of the three defendants without forming an opinion regarding the third defendant. Such a jury cannot be impartial; rather, it is 'predisposed to find guilt.' " (*Id.* at p. 729, italics added, fn. omitted.) "The dispositive factor . . . is that the prosecution presented all its evidence in the first phase of the trial but the defense was postponed until after the jury deliberated." (*Id.* at p. 730.)

The bifurcated trial here was quite different. The penalty decision as to Veasley was distinct from the penalty decision as to Cleveland. There might have been a problem if the prosecution had presented evidence at Veasley's trial that related to Cleveland—for example, victim impact evidence—or if Veasley had presented evidence regarding the charged crimes—for example, his own testimony blaming Cleveland. But none of the evidence presented at Veasley's penalty trial pertained to Cleveland. The prosecution presented evidence of other crimes Veasley committed and Veasley presented mitigating evidence regarding himself. All evidence relevant to Cleveland was presented at either the nonbifurcated guilt phase or Cleveland's own penalty trial.

Cleveland focuses on the arguments of counsel. He claims that some of the arguments at Veasley's penalty trial pertained to him as well as Veasley, and that the jury could not disregard the arguments from the first phase in considering the second phase. The prosecutor did, naturally, discuss the charged crimes in urging the death penalty for Veasley, but she did the same later in urging the death penalty for Cleveland. Counsel for Veasley argued that there was no evidence Veasley was the actual shooter, that the jury's guilt verdict indicated he was not the actual shooter, and that the actual shooter was more culpable than the nonshooters. The "end result," Cleveland argues, "was a procedure that 'essentially created two prosecutors' against [him], forcing [him] to present mitigating evidence to the same jury that had already heard his codefendant's mitigating evidence (aggravating to [Cleveland]) and closing argument, and the prosecutor's aggravating evidence and closing argument." Although the risk was present, the actuality was not. Veasley's

mitigating evidence was *irrelevant*, not aggravating, to Cleveland. The prosecution's aggravating evidence against Veasley was also irrelevant to Cleveland. Veasley's attorney did not argue that Cleveland was the actual killer, only that there was no evidence that Veasley was the killer. All relevant argument regarding the crimes and Cleveland's role was presented at his separate trial, and he was able to respond fully to the jury at that time. The evidence and argument at Veasley's trial did not prejudice Cleveland.

At Cleveland's separate trial, moreover, the jury heard, for the first time, Peterson's testimony that Veasley had admitted shooting the victims. From the jurors' perspective, this testimony may have tended to vindicate their death verdict as to Veasley, but, if anything, it suggested a reason to reach a different verdict as to Cleveland. The testimony also neutralized any suggestion at Veasley's penalty trial that Cleveland was the shooter. We see no reason why Veasley's penalty trial and the jury's verdict at that trial would have biased the jury at Cleveland's penalty trial or made it unable to reach a fair and reasoned verdict regarding Cleveland. We are confident that the actual verdict against Cleveland was based on the evidence and arguments presented at the guilt phase and Cleveland's penalty phase and was not influenced to his detriment by Veasley's intervening penalty trial.

 Cleveland also contends that his right to be present at trial was violated by his absence at Veasley's penalty trial. This contention is intertwined with the rest of his challenge to the bifurcation and fails for the same reasons. If Veasley's penalty trial had related to him, his presence would have been required. But it did not relate to him. Accordingly, his absence did not bear a reasonable and substantial relation to his opportunity to defend himself. (*People v. Hines, supra,* 15 Cal.4th at pp. 1038–1039.) Cleveland was present at the entire guilt phase and his own penalty trial, at which all evidence and argument regarding himself was presented; he was fully able to represent his interests at those phases.

### 2. *Veasley's Penalty Phase Claims*

#### a. *Excluding Defense Evidence*

Veasley's mother, Tressie Williams, testified on his behalf that Amelia Gonzalez, the mother of one of his children, lived in Northern California. Defense counsel asked whether Gonzalez had wanted to testify at the trial, and she answered, "Yes." The court sustained the prosecutor's hearsay objection, and instructed the jury to disregard the response. Williams then testified that Gonzalez was going to travel with her from Northern California, but she was pregnant and went into labor at the airport. Her water broke and she was taken to a hospital. She also testified that Gonzalez and Veasley had

a "good relationship" and they were "best friends." She also testified about Veasley's relationship with his children and their other mothers.

 Veasley claims the court violated his federal constitutional right to present mitigating evidence by sustaining the hearsay objection. However, he never asserted any constitutional right or, indeed, any other basis for admitting the excluded evidence. Instead, he simply elicited other evidence regarding the relationship between Gonzalez and Veasley. Accordingly, the issue is not cognizable. (*People v. Alcala* (1992) 4 Cal.4th 742, 795–796 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People v. Rowland* (1992) 4 Cal.4th 238, 265, fn. 4 [14 Cal.Rptr.2d 377, 841 P.2d 897].) We also see no error. The evidence was hearsay, and Veasley does not suggest it comes within an exception to the general rule that hearsay is inadmissible. (Evid. Code, § 1200.) Veasley argues that his right to present mitigating evidence mandated its admission. However, the rule permitting a defendant to admit all relevant mitigating evidence has not "abrogated the California Evidence Code." (*People v. Edwards* (1991) 54 Cal.3d 787, 837 [1 Cal.Rptr.2d 696, 819 P.2d 436].) "The United States Constitution compels the admission of hearsay evidence only if the proponent shows the evidence is highly relevant to a critical issue and is sufficiently reliable." (*People v. Smith* (2003) 30 Cal.4th 581, 629 [134 Cal.Rptr.2d 1, 68 P.3d 302].) Veasley made no attempt to meet these requirements at trial. The hearsay was not highly relevant to a critical issue. The relationship between Veasley and Gonzalez was not a critical issue, and Veasley could, and did, present evidence of that relationship by other means.

### b. *Alleged Prosecutorial Misconduct*

The district attorney argued to the jury that it "may not relish the idea of having . . . to sit in judgment on somebody else's life," but that Veasley was responsible for bringing the jury "to this courtroom . . . to face this task," and that the jury should only "blame . . . [Veasley] for putting you in a position that you're now in." She concluded her argument, "You'll see that death . . . is the appropriate vote in this case. It's a punishment that this defendant has imposed upon himself . . . as a consequence of his conduct, his behavior."

 Veasley claims "the prosecutor committed misconduct by attempting to shift responsibility for the requested death verdict from the jury to [himself]." (See *Caldwell v. Mississippi, supra,* 472 U.S. 320.) He did not object to any of these remarks. Nevertheless, we have stated, without explanation or citation to authority, that "[w]e have never required an objection to raise claims of error based upon *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] . . . ." (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1104 [259 Cal.Rptr. 630, 774 P.2d 659]; see also *People v. Jackson* (1996) 13 Cal.4th 1164, 1238 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [citing *Bittaker*

without further explanation]; *People v. Clark* (1993) 5 Cal.4th 950, 1035 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [same]; cf. *People v. Arias* (1996) 13 Cal.4th 92, 180 [51 Cal.Rptr.2d 770, 913 P.2d 980] [claim of similar error found forfeited but also lacking in merit].) On reflection, we see no reason to carve out an exception to the general rule that a defendant must object to misconduct at trial to raise the claim on appeal. (*People v. Riel, supra*, 22 Cal.4th at p. 1212.) If the prosecutor improperly suggests the responsibility for a death verdict rests elsewhere, an admonition could normally cure any harm. (*Ibid.*) We believe, therefore, that a defendant should be required to object to this type of misconduct just as to any other type of misconduct. (See generally *People v. Green* (1980) 27 Cal.3d 1, 27–34 [164 Cal.Rptr. 1, 609 P.2d 468].) Accordingly, in all trials held after this decision becomes final, a defendant will be required to object to prosecutorial misconduct on this basis in order to raise the issue on appeal. However, at this trial, Veasley was not on notice that he had to object on this basis. So we consider the issue on the merits as to him. (See *People v. Riel, supra*, 22 Cal.4th at p. 1220; *People v. Scott* (1994) 9 Cal.4th 331, 358 [36 Cal.Rptr.2d 627, 885 P.2d 1040].)

The claim lacks merit. "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Caldwell v. Mississippi, supra*, 472 U.S. at pp. 328–329 [prosecutor argued the jury would not determine whether the defendant would die because a higher court would review a death sentence].) The prosecutor did not violate this mandate. She made clear the jury alone had to make this determination and merely placed the blame for this circumstance on Veasley. She did not suggest that *Veasley* would determine whether his own death was appropriate. Nor did she try to shift the responsibility for the decision to anyone else, such as a higher court. Indeed, she told the jury, "You decide what penalty to impose." "The prosecutor sought only to emphasize 'that the moral blame for the crimes and their consequences rests with defendant, not with the jurors,' and this is not improper." (*People v. Arias, supra*, 13 Cal.4th at p. 180.)

### c. Sealing the First Penalty Verdict

At the district attorney's request, and over Veasley's objection, the trial court ordered the jury's verdict as to Veasley sealed until after the jury had also rendered its verdict as to Cleveland and Charan. It believed that sealing the first verdict so that both verdicts could be announced simultaneously at the end of the trial would best ensure that the jury would hear the evidence and deliberate at the second penalty trial "as comfortably as possible, as openly as possible." It was also concerned to protect defendants' rights while

sealing the verdict. Accordingly, and following the procedure the court established, when the jury announced that it had reached a verdict as to Veasley, the court examined the verdict to make sure it had been properly signed and dated. It then explained to the jury that the verdict would be sealed and not disclosed to anybody else until the jury had reached its verdicts as to Cleveland and Charan. The court also had each juror individually examine the verdict to make sure each agreed with it. It then polled the jurors "as to whether the verdicts that you've examined are your true and correct verdicts." Each juror individually affirmed that the verdict was his or her "true and correct" verdict. The court then sealed the verdict until after the second penalty trial. After the jury reached its verdict as to Cleveland and Charan, and in the presence of all defendants and the jury, the court announced each of the verdicts, including the death verdict as to Veasley. The court again polled the jury, and each juror individually affirmed that the verdicts, including the death verdict as to Veasley, were his or her own.

 Veasley argues this procedure violated his rights to a unanimous verdict, jury polling, due process, and a reliable penalty determination. Specifically, he argues this procedure violated the jurors' rights to reconsider their verdict until the decision was complete and "resulted in no true polling of the individual jurors." (See §§ 1163, 1164.) We disagree. Regarding the verdict as to Veasley, the jury was polled *twice* in open court in Veasley's presence: first when it reached its verdict, and again when the verdict was unsealed and announced. Both times any juror could have expressed any disagreement or other dissatisfaction with the verdict. Both times each juror assented that the verdict was, in fact, that juror's true verdict. For this reason, we need not decide whether the jury had the right to reconsider its verdict at the time it was unsealed. Sealing the first verdict to announce all verdicts at the same time did not violate any of Veasley's rights.[10]

### 3. *Cleveland's Penalty Phase Claims*

#### a. *Alleged Prosecutorial Misconduct*

Cleveland adopts Veasley's argument that the prosecutor committed error under *Caldwell v. Mississippi, supra,* 472 U.S. 320. The argument fails for the same reason the argument fails as to Veasley.

Cleveland also claims the prosecutor committed two other kinds of misconduct in her argument to the jury. He objected to none of the alleged

---

[10] Veasley argues that the cumulative effect of the alleged penalty errors was prejudicial. However, there was no error to accumulate. He also argues the trial court erred in denying his motion for a new trial that was "based on all legal, statutory, constitutional issues." Because this argument in effect merely repeats Veasley's other arguments in a different form, we do not discuss it separately. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 496, fn. 2.)

misconduct. Because an admonition could have cured any harm, the contentions are not cognizable. (*People v. Riel, supra*, 22 Cal.4th at p. 1212.) In any event, no misconduct appears.

In discussing section 190.3, factor (h) (whether "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication"), the prosecutor said: "That has to do with insanity[]whether a person is insane and can't understand the nature of his acts or whether he is so drunk or so intoxicated by drugs or alcohol that he doesn't have control over himself or doesn't realize what he's doing. There's absolutely no evidence of that in this case whatsoever, so (h), doesn't apply." Noting that Peterson testified that he had drunk some tequila, and that she had earlier stated that he had been "blacking out off and on" at her house the day he was shot in the hand, Cleveland claims this argument violated his right to have the jury consider any evidence a defendant offers in mitigation. (*Skipper v. South Carolina* (1986) 476 U.S. 1, 4–8 [90 L.Ed.2d 1, 106 S.Ct. 1669].) It did not. The prosecutor reasonably argued that there was no evidence of impairment. She did not argue that the jury was not *permitted* to consider section 190.3, factor (h), but only that no evidence supported it. Although a jury may not be prevented from considering mitigating evidence, the prosecutor may argue that the evidence does not, in fact, support a particular mitigating factor. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1222 [65 Cal.Rptr.2d 240, 939 P.2d 354].)

The prosecutor argued, "I haven't heard Cleveland make any excuses for his violent conduct." Cleveland claims this argument improperly commented on his failure to testify. (*Griffin v. California* (1965) 380 U.S. 609 [14 L. Ed. 2d 106, 85 S. Ct. 1229, 32 Ohio Op. 2d 437].) It did not. The prohibition does not extend to comment on the state of the evidence or the defendant's failure to introduce evidence or call logical witnesses other than himself. (*People v. Clair, supra*, 2 Cal.4th at p. 662; *People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776].) Contrary to Cleveland's argument, "excuses for his violent conduct" could have come in many forms other than his testimony: for example, expert testimony regarding his mental state, evidence of his past, evidence from Peterson or someone else that might have provided some kind of an excuse, even argument by defense counsel. We find no reasonable likelihood the comment "could have been understood, within its context, to refer to defendant's failure to testify." (*People v. Clair, supra*, at p. 663.)

b. *Jury Instructions*

Cleveland argues the court had a sua sponte duty to instruct the jury at his bifurcated penalty trial not to consider the evidence and argument presented

at Veasley's penalty trial. He notes that the court gave standard penalty phase instructions, which said that the jury "must determine what the facts are from the evidence received during the entire trial . . . ," and referred to the jury's "having heard all of the evidence and . . . having heard and considered the arguments of counsel . . . ." (See CALJIC Nos. 8.84.1, 8.88.) He argues that without further instruction, the jury would believe it should consider the evidence and arguments presented at Veasley's trial as well as at Cleveland's trial. We disagree. The court explained to the jury at the outset of the penalty phase that portion of the trial would be bifurcated, and the "first part will be as to Mr. Veasley only . . . and then we will have the penalty phase as to Mr. Charan and Mr. Cleveland after that." The evidence presented at Veasley's penalty trial was relevant only against Veasley. Although some of the argument at that trial might also have been relevant to Cleveland, that argument was directed solely against Veasley. All argument relevant to Cleveland was also made at Cleveland's own penalty trial. It was clear to the jury that the two penalty trials were separate, a concept that was not difficult to understand. Under the circumstances, the jury would have understood the references to the "entire trial" and to the evidence and arguments of counsel to refer to Cleveland's trial, not Veasley's. If Cleveland had believed further explanation was required, he should have requested it. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 504.) He did not.

Cleveland also reiterates a number of instructional arguments we have already rejected. The jury need not agree unanimously as to aggravating circumstances or find that death is the appropriate sentence beyond a reasonable doubt. (*People v. Carpenter, supra,* 15 Cal.4th at p. 421.) The recent decisions of *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] do not affect California's death penalty law. (*People v. Smith, supra,* 30 Cal.4th at p. 642, and cases cited.) The standard jury instructions on the weighing process the jury must undertake (CALJIC No. 8.88) adequately channel the jury's discretion. (*People v. Arias, supra,* 13 Cal.4th at pp. 170–171.)

### c. *Denial of Allocution*

Cleveland claims the court denied him his right to make a statement in allocution before it imposed the death sentence. However, he never asserted the right and, in any case, the right does not exist.

A few days after the jury rendered its verdict, Cleveland sent a handwritten note to the judge asking him to modify the sentence to life in prison. The note contained no substantive argument why the court should do so. At the next court hearing, the court stated it had not opened the letter because it wanted

to give Cleveland's attorney an opportunity to review it first. Defense counsel asked the court to consider the letter. The court postponed the matter until it actually heard the modification motion but told Cleveland, "If you want to make a statement I would certainly entertain the statement that you would want to make." At the hearing on the modification motion, defense counsel argued at length that the court should modify the verdict to a life sentence. Neither counsel nor Cleveland suggested that Cleveland wanted to address the court personally. After counsel finished arguing, the court made its oral ruling denying the motion. Cleveland interrupted the court twice during its ruling, once saying, "I'll tell you that much," and once saying, "Are you done now?" After the court denied the motion, it asked if there was legal cause why judgment should not be pronounced. Defense counsel stated there was not and also responded affirmatively when the court asked whether the defendant waived arraignment for judgment. At this point, Cleveland stated, "You talk to me about waiving the arraignment and stuff?" The court did not respond to this statement but instead proceeded to pronounce judgment. At the end of the hearing, Cleveland said, "Short shit."

■ Thus, Cleveland sent the court a short note that simply asked it to modify the verdict, and he interrupted the court a few times in open session. But he never sought to exercise any right of allocution despite the court's statement that it would permit him to speak. Instead, defense counsel spoke for him and supplied the arguments that were missing from Cleveland's handwritten note. Thus, the court did not prevent Cleveland from speaking. In any event, because a defendant has the right to testify at the penalty trial, we have repeatedly "held that the defendant does *not* have the ' "right to address the sentencer without being subject to cross-examination" in capital cases.' " (*People v. Hunter* (1989) 49 Cal.3d 957, 989 [264 Cal.Rptr. 367, 782 P.2d 608]; see also *People v. Davenport*, *supra*, 11 Cal.4th at p. 1209.) ■ Moreover, at the hearing on the modification motion, the court is limited to considering the evidence presented at the penalty trial. (*People v. Raley* (1992) 2 Cal.4th 870, 921 [8 Cal.Rptr.2d 678, 830 P.2d 712].) The court did not deprive Cleveland of any right of allocution.

### E. *Other Contentions*

#### 1. *Denial of Modification Motion*

"Section 190.4 provides for an automatic motion to modify the death verdict. In ruling on the motion, the trial court must independently reweigh the evidence of aggravating and mitigating factors presented at trial and determine whether, in its independent judgment, the evidence supports the death verdict. The court must state the reasons for its ruling on the record. On appeal, we independently review the trial court's ruling after reviewing the

record, but we do not determine the penalty de novo." (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].) The trial court granted the motion to modify the verdict as to Charan, but denied it as to Veasley and Cleveland. Veasley contends the court erred in denying the motion as to him.

The court found "that the murders of Anthony Nelson and Charles Hunter were intentional killings personally committed by Mr. Veasley with co-defendant[s] Mr. Cleveland and Mr. Charan. And that the murders were premeditated, deliberated, willful and with malice aforethought." Veasley argues the finding that Veasley "personally" murdered the victims is unsupported and contrary to the jury's guilt verdict. However, we read the comment as just meaning that the three defendants personally committed the murders in the sense that they were at the scene and personally participated in the crimes with premeditated intent to kill. The court did not suggest that Veasley, and certainly not all three defendants, personally shot the victims. Indeed, it had previously expressly stated that it was *not* considering Peterson's testimony at the second penalty trial that Veasley admitted shooting the victims.

The court stated that the "cold blooded plan to rob and murder" the victims was Veasley's, and Veasley "outlined to his cohorts the plan to lure the victims to the All Star Inn in Pomona and after robbing them of their cocaine and other valuables *he called for the victims' execution*." (Italics added.) Veasley argues the italicized language is factually unsupported because there is no evidence he "exhorted his colleagues to kill the victims." However, the evidence supports the court's statement. Peterson testified that after the first shooting, Veasley criticized Cleveland for not "blast[ing] all those people." He told Cleveland and Charan "they could go to Pomona and bump off his supplier." He said the victims "had to be taken care of because [Nelson] knew him . . . ." Saying that Veasley called for the victims' execution is a reasonable summary of this evidence.

In reviewing Veasley's prior criminal conduct, the court referred to the 1984 commercial burglary in which "he allegedly and according to the proof used a sawed-off shotgun." Veasley argues that he merely *possessed* a sawed-off shotgun while committing the burglary, but he did not *use* it. It appears the court meant the word "used" loosely in the sense of having the gun, not in the strictly legal sense of gun use. In any event, any misspeaking was minor. The evidence showed that Veasley was, indeed, the leader in a particularly "cold blooded" double murder. We see no reasonable possibility any misstatement affected the court's sentencing decision. (*People v. Benson* (1990) 52 Cal.3d 754, 812 [276 Cal.Rptr. 827, 802 P.2d 330].)

### 2. *Noncapital Sentencing Issues*

In addition to sentencing Cleveland and Veasley to death for the murders, the court imposed sentence on the robbery and conspiracy counts, and then stayed the sentences. It also stated, "If for any reason the death penalty is not imposed the said stays are dissolved and the consecutive sentences to run consecutive to the murder counts . . . ." Cleveland argues that section 654 requires the robbery and conspiracy sentences to remain stayed even if the death penalty is not imposed. (See generally *People v. Latimer* (1993) 5 Cal.4th 1203 [23 Cal.Rptr.2d 144, 858 P.2d 611].) Thus, he argues that if we overturn the death judgment, and he is thereafter resentenced for the murders, the robbery and conspiracy terms must be stayed. It is not entirely clear what the court meant in this statement. However, we are affirming the death judgment, and the original stays are still in effect. If Cleveland or Veasley is ever resentenced on the murder counts, the question whether sentencing on the other counts must be stayed can be considered at that time. The current sentence need not be modified.

According to the reporter's transcript, the court sentenced Veasley to five years in prison for the prior conviction and "on the one-year prior under [section 667.5, subd. (b)], to one year," which the court stayed. As Veasley points out, however, he was charged with and admitted only a prior serious felony conviction under section 667, and not a prior prison term under section 667.5. Thus, the reference in the reporter's transcript to a one-year term under section 667.5 is incorrect. However, the minute order and abstract of judgment in the clerk's transcript are correct. Neither mentions a prior prison term or section 667.5. Under the circumstances, we will deem the minute order and abstract of judgment to prevail over the reporter's transcript. (*People v. Smith* (1983) 33 Cal.3d 596, 599 [189 Cal.Rptr. 862, 659 P.2d 1152]; *People v. Malabag* (1997) 51 Cal.App.4th 1419, 1426–427 [59 Cal.Rptr.2d 847].) The erroneous statement in the reporter's transcript is of no effect.

### 3. *Challenges to Death Penalty Law*

 Veasley, joined by Cleveland, reiterates various challenges to California's death penalty law that we have rejected. The death penalty is not per se unconstitutional. (*People v. Steele, supra,* 27 Cal.4th at p. 1269; *People v. Samayoa* (1997) 15 Cal.4th 795, 864–865 [64 Cal.Rptr.2d 400, 938 P.2d 2].) The death penalty law adequately narrows the class of death-eligible defendants. (*People v. Burgener* (2003) 29 Cal.4th 833, 884, & fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1].) Intercase proportionality review is not required. (*People v. Riel, supra,* 22 Cal.4th at p. 1223.) We do undertake intracase proportionality review on request to determine whether the penalty is disproportionate to the defendant's personal culpability, although the

disposition that accomplices received is not part of that review. (*Ibid.*)[11] The jury need not unanimously find aggravating circumstances as long as the penalty determination itself is unanimous. (*People v. Anderson* (2001) 25 Cal.4th 543, 590 [106 Cal.Rptr.2d 575, 22 P.3d 347].) Prosecutorial discretion in deciding whether to seek the death penalty does not render the law unconstitutional. (*People v. Steele, supra,* at p. 1269.) The method of execution is not unconstitutional. (*People v. Hughes* (2002) 27 Cal.4th 287, 406 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Samayoa, supra,* 15 Cal.4th at p. 864.) "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse, supra,* 27 Cal.4th at p. 511.) Finally, the delay of execution while defendants pursue this appeal does not render the death judgment unconstitutional. (*People v. Frye, supra,* 18 Cal.4th at pp. 1030–1031.)

### III. CONCLUSION

We affirm the judgments.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

**CHIN, J.**—Obviously, I concur in the majority opinion I have prepared for the court. I am writing separately to comment on the absurdity of trial and appellate courts—as well as prosecutors and defense attorneys—expending energy and resources dealing with lesser sentencing issues when the defendant has also been sentenced to death or prison for life without the possibility of parole (LWOP), and to suggest a legislative solution.

In *People v. Moore* (1984) 162 Cal.App.3d 709 [208 Cal.Rptr. 771], the trial court sentenced the defendant to LWOP for two murders but also calculated a 60-year sentence for many other felony convictions. The defendant "complain[ed] of numerous sentencing errors in this 60-year sentence, and urge[d] remand for resentencing." (*Id.* at p. 718.) The Court of Appeal, however, refused to consider those contentions. "[A]s we are affirming the judgment in its entirety, including the special circumstances findings, we need not address the sentencing errors alleged by appellant." (*Ibid.*) Other courts

---

[11] Neither Veasley nor Cleveland specifically request intracase proportionality review, but the death penalty they face is not disproportionate to their individual culpability. (*People v. Riel, supra,* 22 Cal.4th at pp. 1223–1224.) Whether or not either was the actual shooter—the evidence against Veasley is inconclusive, and the evidence regarding Cleveland suggests he was not the actual shooter—both engaged in a carefully premeditated, execution-style double murder. The death sentences do not shock the conscience. (*Id.* at p. 1224.)

have not followed this approach, possibly because no statutory provision expressly permits it, and have decided sometimes complex sentencing issues while affirming a death or LWOP sentence. In *People v. Coleman* (1989) 48 Cal.3d 112 [255 Cal.Rptr. 813, 768 P.2d 32], for example, we affirmed a judgment of death but also considered numerous other sentencing issues and remanded for the trial court to resentence the defendant on noncapital counts. (*Id.* at pp. 160–166.) Later, we affirmed the new judgment on appeal from that resentencing. (*People v. Coleman* (1991) 53 Cal.3d 949 [281 Cal.Rptr. 146, 809 P.2d 921].) Other examples abound. (E.g., *People v. Osband* (1996) 13 Cal.4th 622, 728–732 [55 Cal.Rptr.2d 26, 919 P.2d 640] [considering sentencing issues despite affirming judgment of death]; *People v. Davis* (1995) 10 Cal.4th 463, 551–552 [41 Cal.Rptr.2d 826, 896 P.2d 119] [similar]; *People v. Bracamonte* (2003) 106 Cal.App.4th 704 [131 Cal.Rptr.2d 334] [published portion of opinion considers only sentencing issues despite affirming an LWOP sentence].)

When a person has been sentenced to death or LWOP, no need exists to impose any other sentence. Especially in these days of increasingly tight judicial budgets, courts and attorneys can make better use of their resources than litigating issues that have no practical significance. The Legislature might want to consider legislation to minimize this waste of resources. Such legislation might take many forms, but one simple approach comes readily to mind. The Legislature might provide that if the trial court imposes a sentence of death or LWOP on any count, it need not impose any other sentence, including enhancements. If the convictions are ever set aside or modified to reduce the sentence to something less than LWOP, the court can resentence the defendant on the remaining counts at that time. The defendant could appeal the resentencing, with the appeal limited to issues arising out of that resentencing. Even now, when a murder conviction or special circumstance is reversed, resentencing is often necessary, so little would be lost by such a procedure. In most cases, the court would never have to sentence on the remaining counts, and the parties would never have to litigate meaningless issues.

These are just thoughts. Better approaches might exist. In the meantime, I concur in the court's opinion, including rejecting defendants' claims of noncapital sentencing error.

Appellants' petitions for a rehearing were denied June 9, 2004.